(No. 37641.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LOUIS WRIGHT, Plaintiff in Error.

*Opinion filed March 18, 1964.—Rehearing denied May 19, 1964.*

FREDERIC F. BRACE, JR., of Chicago, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and ELMER C. KISSANE and MATTHEW J. MORAN, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE SOLFISBURG delivered the opinion of the court:

In 1957 the defendant, Louis Wright, was indicted by the grand jury of the criminal court of Cook County for two crimes of rape and two crimes of burglary. He was tried by the court without a jury and found guilty on each indictment. The four judgments of conviction were reviewed by this court and we reversed all of the judgments and remanded the causes for new trials on the ground that the State had failed to produce all of the witnesses to alleged confessions made by the defendant. (*People* v. *Wright*, 24 Ill.2d 88.) In 1962 the defendant was tried by jury on one of the indictments, charging him with the rape

of Virginia Olson. He was found guilty and sentenced by the court to a term of 60 years imprisonment. A writ of error has been issued to review this judgment.

Although the defendant does not argue that the evidence was insufficient, we find it necessary to briefly summarize the testimony. Mrs. Olson testified that she was awakened at about 3 :00 A.M. on March 18, 1957, by a man who was standing over her bed with a sharp object pressing her chest. He told her that he would kill her if she screamed and proceeded to rape her. He was only in the room for two or three minutes and fled when he heard a noise from the back of the house. Mrs. Olson ran downstairs, awakened her brother-in-law, and told him she had been raped. She described the room as dark and the window shade was halfway down. The only light came from a street light about 10 feet from the house and this light fell on the man's back and not on his face. She also stated that her wedding ring and engagement ring, which she had placed on her dresser, had been stolen. Between March 18 and March 22 she went to three or four police line-ups but was unable to identify anyone. On March 22 she again attended a police line-up where she identified the defendant, but she said that she was unable to identify the defendant until she heard his voice. On cross-examination, Mrs. Olson said that she had given a signed statement to two police officers at the Englewood police station, but she did not know their names. Defense counsel asked the prosecutor whether they had that statement and one of the prosecutors replied that he had made a search of the entire police department and was unable to locate the statement. The inability of the prosecution to produce this statement, and other statements, is one of the grounds relied upon for reversal and will be more fully discussed later. On further cross-examination, Mrs. Olson said at one time that she didn't remember what she had told the police immediately following the crime, and at another time said that she had told the police that she didn't

know if she would be able to identify the defendant.

Police officer Cassidy testified that he obtained from a pawn shop a wedding ring and an engagement ring which were identified by Mrs. Olson as the ones stolen from her room. The pawn broker testified that the rings had been pawned by Herbert Henson while accompanied by the defendant.

Police officer Barrett testified that on March 22, at about 2:20 A.M. he followed a car in which two men were riding. When the car stopped, the officer found Herbert Henson hiding in the car and the officer searched the vicinity, looking for the other occupant. He saw the defendant crouched by a door on the second floor of an apartment building. When Barrett shouted to the defendant, the defendant first came down about four steps and then ran back upstairs and broke through a door. The officer heard a lot of people screaming and felt it would not be safe to pursue the defendant into the apartment because some of the tenants might get hurt. The officer ran outside to the rear of the apartment building in time to see the defendant dive through a closed window and land at the officer's feet. The officer told the defendant he was under arrest and the defendant begged him not to shoot and promised that he would not run. However, the defendant did flee from the officer and after firing two shots at the defendant, the officer lost him. A short time later other police officers converged on the scene and searched the vicinity. At about 3:30 A.M. officer Barrett and several other officers observed the defendant hiding on a second floor porch. The officers ordered him to come down and after first attempting to enter an apartment, the defendant came down and was placed under arrest.

For the defense the defendant testified that he was not in Mrs. Olson's room and did not rape her. On cross-examination he stated that he was home in bed at the time, and denied that he ever went to the pawn shop, or that he

gave any rings to his half-brother Herbert Henson. He said he obtained two rings from a man named Joseph and put them in his dresser drawer. He did not see them again until the police recovered them from the pawn shop.

A member of the Chicago Bureau of Electricity testified that the street lights in the vicinity of Mrs. Olson's home had been installed prior to September, 1955, and that their location had not been changed since that date. Another defense witness measured the distance between Mrs. Olson's bedroom window and the nearest street light and found that the light was 90 feet north of the window.

In rebuttal the prosecutor read a portion of the defendant's testimony at the former trial in which he stated that he had received the rings on March 18 and had given them to Henson to sell, and that he had gone with Henson to the pawn shop when he had sold the rings.

The defendant argues that proof of the circumstances surrounding the defendant's arrest improperly brought before the jury prejudicial evidence of other crimes. In our opinion this contention cannot be sustained. It is well established that the State may prove that a defendant resisted arrest or fled from arrest, since evidence of flight is competent as tending to show guilt of the crime charged in the indictment. In *People* v. *Anderson,* 17 Ill.2d 422, the crime occurred on October 1 and we held that it was proper to show the defendant's resistance to arrest on October 8 and to show that the defendant shot a police officer while resisting arrest. In *People* v. *Davis,* 14 Ill.2d 196, the crimes occurred in March and April and it was held that no error was committed in providing that the defendant resisted arrest in June. The arrest in the present case occurred four days after the crime and in our opinion it was not error to show that the defendant fled when he was ordered to surrender. The fact that this evidence also brought out that the defendant broke through the door of an apartment does not render the evidence improper.

The defendant also contends that the prosecutor's argument to the jury was so prejudicial as to require a reversal of the conviction. In particular, the defendant contends that the prosecutor improperly dwelt upon the circumstances of the defendant's arrest and asked the jury to convict the defendant because of his conduct at that time. The abstract shows that in several of the instances of which complaint is now made, no objection was made at the time of the argument. We have reviewed the entire argument and find that the prosecutor argued that the principal issue in the case was identification and that because criminals operated in the dark it was sometimes difficult to obtain identification. The prosecutor argued that the jury could properly consider the fact that the defendant fled from arrest four days after the crime as bearing upon his guilt and that the jury could also consider that the defendant was in the company of Henson when Henson pawned the rings stolen from Mrs. Olson's apartment. The prosecutor argued that when the defendant fled from arrest he committed another burglary, apparently referring to the breaking and entering of the apartment. Defense counsel objected to the argument and the court sustained the objection and noted that there was no evidence of any burglary. The prosecutor argued that many criminals wear masks to prevent identification. Counsel objected on the ground that there was no evidence of masks in the case and the court sustained the objection and advised the jury to disregard any reference to masks. A review of the prosecutor's argument satisfies us that it did not exceed the bounds of fair argument except in the two instances where the trial court promptly sustained defendant's objections. We find nothing in the argument sufficient to require reversal.

The defendant also contends that the jury should have been permitted to fix the punishment as well as to determine his guilt. His argument is that under the law in effect at the time the crime was committed, the jury fixed the punish-

ment, and that the subsequent change brought about by the Criminal Code, under which the court fixes the punishment, was not applicable to him. We find no need for extended discussion of this point. In *People* v. *Johnson*, 23 Ill.2d 465, we held that in cases where the crime occurred before the effective date of the new Criminal Code, and where the trial is conducted after that date, the defendant could properly be sentenced by the court instead of the jury. In our opinion the sentence was properly fixed by the court rather than by the jury. *People* v. *Mackey*, 30 Ill.2d 190.

The final contention advanced by the defendant is that he was denied a fair trial by reason of the fact that the court refused to permit the defendant to examine the police file to determine whether it contained a statement of Mrs. Olson, which could be used for impeachment purposes. Prior to trial the defendant advised the court that he had subpoenaed the police department file and that the file had been produced in court. Counsel asked to inspect the file but the prosecutor objected and the court stated that counsel could inspect the file after a witness had testified, but could not do so prior to trial. The first request to see a witness's statement during the trial came when Mrs. Olson testified that she had given a signed statement to two police officers, whose names were unknown. The prosecutor stated that he was unable to locate the statement and defense counsel then asked whether the State had a report of the police officer to whom Mrs. Olson had spoken and the prosecutor replied that he did not know who that officer was. Defense counsel replied that Mrs. Olson apparently did not know the name of the officer either and reminded the court that he had subpoenaed the police file and had made a motion prior to trial that the file be turned over to him. He then moved that the court order the State to produce those portions of the police file which contained statements or reports made by Mrs. Olson. The prosecutor replied that he would produce whatever he had, but that he

had no statement, or report of a statement, made by Mrs. Olson. Defense counsel then stated, "Now to make this perfectly clear, Mr. Garippo, you have nothing from your own file or from the police department files which contains any report of any statement made by Mrs. Olson. Is that correct? Didn't some officer say he talked to Mrs. Olson about it and she said yes." The prosecutor replied, "There is no report. In other words, there isn't an investigating officer's report made on the witness. We have looked high and low. Over five years ago." The court then replied, "All right, they don't have it. Proceed. You are entitled to it if they have it. They say they don't have any." Mrs. Olson then resumed her testimony on cross-examination. During the course of this testimony she said that on the morning of March 18 she had told the police that she was not sure that she would be able to identify the man who had attacked her and also said that she didn't remember what answer she gave the police. She said that she had talked to police officers Nolan and Cassidy but did not remember the names of the officers to whom she had first spoken. She said that the name Crane sounded familiar. Defense counsel then requested the State to produce any reports by these officers relating to the case or to the witness's testimony. The court asked the prosecutor if they had any such reports and one of the prosecutors replied that they had a statement from Nolan and Cassidy of the pawn shop detail, and a copy of this statement was then given to defense counsel. The court asked the prosecutors whether they had any report of any other officer to whom Mrs. Olson had spoken, and said that if they had any such report it should be furnished to defense counsel. One of the prosecutors replied that he had a report of two police officers as to the arrest of the defendant but that this was all of the police reports that he had. The court told the prosecutors that if they had any record of any conversations, they should be given to defense counsel. The prosecutor then explained that the

case was a 1957 case in which a conviction had been obtained on four indictments. He explained that the case went to the Supreme Court where the judgments were reversed, and he stated that when the mandate of the Supreme Court was filed in the trial court, he got out his file and the only thing in the file was the grand jury minute-sheet, the indictments, and the cover sheet. He caused a search to be made of the file of the State's Attorney, the police department, the Organized Crime Division, the Commissioner's office and Chief of Detective's office, but the balance of the file could not be located. The prosecutor remarked that defense counsel had better luck with his subpoena, because the police department had brought in a file in response to the subpoena. The prosecutor objected to allowing defense counsel to look through the entire police file and stated that counsel was entitled only to reports which could be used for impeachment purposes. Defense counsel stated that he could not know whether any portion of the department file could be used for impeachment until he had an opportunity to see it. The prosecutor pointed out that counsel should first lay a foundation for impeachment and defense counsel replied that he was unable to do so because Mrs. Olson had testified that she did not remember what she said to the police. The court then denied counsel's motion to inspect the police file on the ground that an insufficient foundation for impeachment had been laid and also because counsel had not shown that any of the documents in the police department file were material.

The defendant contends that the court erred in denying defense counsel's request to examine the police department file. His contention is based upon our decisions in *People* v. *Moses*, 11 Ill.2d 84, and *People* v. *Wolff*, 19 Ill.2d 318, and upon certain decisions of the United States Supreme Court. In *People* v. *Moses,* we held that an accused person is entitled to the production by the State of a document in its possession which is contradictory to the testimony of a

prosecution witness. In *Jencks* v. *United States,* 353 U.S. 657, 1 L. ed. 2d 1103, decided three months after *Moses,* the United States Supreme Court held that the defense in a Federal criminal prosecution was entitled, under certain circumstances, to obtain for impeachment purposes, statements which had been made to government agents by government witnesses. The court also held that the defendant need not lay a preliminary foundation of inconsistency between the testimony of the government witnesses and the report, and further held that the trial judge was not to examine the statements to determine if they contained inconsistent material before ordering the statements turned over to the defense. The decision prompted the enactment by Congress of a bill referred to as the Jencks Act, limiting the type of statement which the government was required to produce, and providing procedures for the deletion of material in such statements which were unrelated to the testimony of the witness. (18 U.S.C. sec. 3500.) Subsequent decisions of the United States Supreme Court have been concerned with a construction of the Jencks Act, and particularly with a determination of whether a statement requested by the defense was the type specified in the act. In the first of these cases, *Palermo* v. *United States,* 360 U.S. 343, 3 L. ed. 2d 1287, 79 S. Ct. 1217, the court noted that the act provided no procedure for determining whether a statement came within the statutory definition. The court approved the practice of having the government submit the statement to the trial judge for a determination of whether it was a statement covered by the act. In that case the court pointed out that it would be grossly unfair to allow the defense to use statements which could not fairly be said to be the witness's own words. The court also said, (360 U.S. 354.) "The Act's major concern is with limiting and regulating defense access to government papers, and it is designed to deny such access to those statements which do not satisfy the requirements of [the act] or do not relate to

the subject matter of the witness' testimony. It would, indeed, defeat this design to hold that the defense may see statements in order to argue whether it should be allowed to see them."

Shortly after the decision of the United States Supreme Court in *Palermo,* we decided *People* v. *Wolff,* 19 Ill.2d 318, in which we discussed numerous authorities on the question of the production of documents in a criminal case, including the Federal act and the United States Supreme Court cases. We noted that while the Federal rule was one of procedure and not binding upon this court, it represented the latest and most thorough approach to the problem. Accordingly, we adopted the Federal rule and held that where the relevancy and content of a statement or report has been established the trial judge should order the document delivered directly to the accused for his inspection and use for impeachment purposes. We also held that if the prosecution claimed that any such document contained matter not relating to the testimony of the witness sought to be impeached, the trial judge should inspect the document and might, at his discretion, delete unrelated matters before delivery was made to the accused. None of these cases dispose of the problem in the present case. The prosecution agreed in the trial court and agrees here that if they had a statement signed by Mrs. Olson or a police report containing a substantially verbatim report of Mrs. Olson's statement, the defense was entitled to a copy of such statement or report. (*Cf. People* v. *Edmonds, ante,* p. 538.) The issue here is whether the defendant was denied a fair trial because the trial judge refused to permit him to examine the police file to determine whether such a statement or report existed. The cases are not clear on the question of the proper procedure when the prosecution denies the existence of a statement. In *Campbell* v. *United States,* 365 U.S. 85, 5 L. ed. 428, 81 S. Ct. 421, a government witness testified that he had a conversation with an F.B.I. agent

and that the agent wrote down what he had said and read it back to him. The witness thought he signed the statement but was not sure. The trial court ordered the prosecution to produce that statement and the prosecutor stated that he had no such paper as the witness described. The only document in the possession of the prosecutor was a typed interview report by the F.B.I. agent which had been prepared and transcribed some time after the interview with the witness. The issue in the *Campbell* case was whether the interview report qualified as a "statement" under the Jencks Act and the Supreme Court held that the procedure adopted by the trial judge in determining this question was improper. The court's opinion held that the court should have called the agent as the court's witness so that he could be cross-examined by defense counsel on the question of whether the interview report qualified as a "statement" and also so that counsel could inquire as to what had become of the original statement taken from the witness. The court indicated the possibility that if the original statement had been destroyed the trial court might have been justified in striking the testimony of the witness, as provided for in the Jencks Act in cases where the government fails to deliver a statement to the defense. In a separate opinion concurred in by four judges, the question of the procedure to be followed where the prosecution denied possession of a statement was considered. This opinion pointed out that nothing in the legislative history of the Jencks Act suggested the intent of Congress to require the government to preserve all records and notes taken in connection with a criminal conviction and pointed out that Congress surely did not intend to initiate a game of chance whereby the admission of a witness's testimony was made to depend upon a file clerk's accuracy or care. The opinion pointed out that the prosecutor had stated that he did not possess or know the whereabouts of the original statement and pointed out that the defense did not question the truth or accuracy of the prosecutor's re-

marks. Under these circumstances the concurring opinion held that there was no necessity to require a hearing to determine the existence of the original statement. In *United States* v. *Kelly*, 269 F.2d 448, (cert. den. 352 U.S. 904,) the trial court had ordered the prosecution to deliver its entire file to the court for examination to determine whether the file contained the statement of a certain witness. The government refused to turn over the file and the trial court vacated the judgment of conviction. On appeal it was held that the order of the trial court was erroneous since there had been no showing made that the witness had ever made a statement and therefore no basis had been laid for the defense demand.

In *Badon* v. *United States*, 269 F.2d 75, the prosecution denied possession of certain statements. On appeal the court held that as a practical matter the question of whether the government had such documents in its possession was settled by the statements made in open court by the government attorney. In *Johnston* v. *United States*, 260 F.2d 345, (cert. den. 360 U.S. 935,) it was held that a defendant is entitled to the production of a statement for impeachment purposes only after a showing that such a statement exists.

None of these authorities are conclusive on the present question. It is undisputed that a statement signed by Mrs. Olson did at one time exist and was, at one time, in the possession of the State. The prosecutors denied in open court that they had any such statement in their possession and related at considerable length their efforts to find such a statement. There is nothing in the record to indicate that these representations by the prosecution were made in bad faith. However, at the time these remarks were made by the prosecutors, there was present in the court the police department file which had been produced in response to the defense subpoena. The prosecutors conceded that the defendant had had better luck than they because the defense subpoena had produced some documents. The defense re-

peatedly demanded to inspect the file which had been brought into court in response to the subpoena and, although the court indicated at one time that the defense was entitled to see the file, the final ruling denied access thereto. At no time did defense counsel request the court to examine the police department file to determine whether it contained the statement which was sought by the defense, and the ruling of the trial court could be sustained upon the technical ground that defendant had no right to inspect the entire file, (*Palermo* v. *United States,* 360 U.S. 343, 354) and that, absent a defense request that the court examine the file, the court was under no duty to undertake such examination. However, we are of the opinion that such a holding, while technically correct, would be unfair to the defendant under the circumstances of this case. The critical issue in the case was the identification of the defendant. This issue was necessarily determined by the testimony of Mrs. Olson, whose opportunity to observe the defendant was limited by the lack of light and the short time her attacker was in the room. It was therefore of great importance to the defendant that he be permitted to examine any statement made by Mrs. Olson for possible use for impeachment purposes.

As the case now stands, neither the prosecution, the defense, the trial court nor this court know whether the police department file, which was present in court during the trial, contained a statement by Mrs. Olson. In our opinion the interests of justice require a resolution of this question. (*People* v. *Cole,* 30 Ill.2d 375.) It is not, however, necessary to reverse the judgment of conviction because of the failure on the part of the trial court to inspect the file. Rather, the cause will be remanded to the trial court with directions to examine the police department file to determine whether it contains a statement by Mrs. Olson or a statement by a police officer containing a substantially verbatim account of a conversation with Mrs. Olson. If

such a document or documents are found to exist, which would otherwise qualify for impeachment purposes, the trial court will vacate the judgment of conviction and afford the defendant a new trial. If the examination of the file discloses no such statement or report, the trial court shall make a finding of fact to that effect and shall enter a new final judgment of conviction.

The cause is remanded to the criminal court of Cook County for further proceedings in accordance with the views expressed herein.

*Cause remanded, with directions.*