THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MARVIN REGINALD MATHIS, DEFENDANT-APPELLANT.

Argued February 20, 1968—Decided July 3, 1968.

*Mr. Victor R. King* argued the cause for appellant.

*Mr. Arthur J. Timins,* Assistant Prosecutor, argued the cause for respondent (*Mr. Leo Kaplowitz,* Union County Prosecutor, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. We heretofore reversed a judgment imposing a death sentence upon defendant and ordered a new trial. *State v. Mathis,* 47 *N. J.* 455 (1966). Upon the retrial, defendant was again convicted of murder in the first degree and the jury not having recommended life imprisonment, he was again sentenced to die. His appeal comes directly to us. *R. R.* 1:2–1(*c*).

The facts are fully set forth in our opinion on the first appeal. There was no significant departure therefrom on the retrial, except that defendant did not testify and submitted a request to charge with respect to his silence which the trial court delivered to the jury.

A number of issues are projected in the brief filed by assigned counsel and in a further memorandum filed by defendant himself. We see no issue warranting discussion other than a point tendered at argument which we accepted and as to which a further brief was filed. That issue, suggested by cases then before the United States Supreme Court and since decided, *Witherspoon v. State of Illinois,* 391 *U. S.* 510, 88 *S. Ct.* 1770, 20 *L. Ed. 2d* 776 (June 3, 1968), and *Bumper v. State of North Carolina,* 391 *U. S.* 543, 88 *S. Ct.* 1788, 20 *L. Ed. 2d* 797 (June 3, 1968), is whether the right to a fair jury was violated because veniremen were excused for cause on the basis of their position with respect to capital punishment.

I

In *Witherspoon* the State statute, *Ill. Rev. Stat.* 1959, c. 38, § 743, provided that cause for challenge existed in a murder case if a juror shall "state that he has conscientious

scruples against capital punishment, or that he is opposed to the same." As construed, the statute authorized exclusion of a juror who "might hesitate to return a verdict inflicting [death]" and in fact at the trial there involved "the prosecution eliminated nearly half the venire of prospective jurors by challenging, under the authority of this statute, any venireman who expressed qualms about capital punishment." Of the 47 veniremen excused on that account, only 5 "explicitly stated that under no circumstances would they vote to impose capital punishment." 391 *U. S.*, at *p.* 514, 88 *S. Ct.*, at *p.* 1773, 20 *L. Ed. 2d,* at *p.* 780. Although the Court held that on the basis of what was before it or could be judicially noticed, a jury thus selected could not be said to be "an unrepresentative jury on the issue of guilt" (88 *S. Ct.*, at *p.* 1775), such a jury nonetheless "fell woefully short of that impartiality" to which a defendant is constitutionally entitled on the question whether the punishment should be death or life imprisonment (88 *S. Ct.*, at *p.* 1775).

 As we understand *Witherspoon,* it holds that, at least for the time being,[1] the State is entitled to a jury which is "neutral" on the subject of penalty, and to that end may challenge for cause a juror who "would not even consider returning a verdict of death" (88 *S. Ct.*, at *p.* 1776), but that a jury is not representative of the community and hence is not impartial if "it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples

[1] In *fn.* 18 the Court said:

"Even so, a defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to *guilt.* If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. That problem is not presented here, however, and we intimate no view as to its proper resolution."

against its infliction" (88 *S. Ct.* 1777). In other words, we read *Witherspoon* to recognize that the State is entitled to jurors who are impartial as to punishment, but it holds that a juror is impartial even though he has a bias against the State upon that topic, provided his bias is not so strong as to preclude him from considering the issue of punishment. Although a lesser bias might constitute "cause" if it ran against a defendant (*i. e.,* racial, religious, or ethnic prejudice), the bias here involved is deemed to be logically relevant to the question whether the death penalty should be imposed in a given case and hence a jury would be unrepresentative of the community conscience if there were excluded all who would have a distaste for capital punishment. But the State is entitled to "a jury *capable* of imposing the death penalty" (88 *S. Ct.,* at *p.* 1776; emphasis added).

## II

Our cases define cause in terms agreeable to *Witherspoon.* Mere opposition to the death penalty, whether it arises from a religious or conscientious scruple or any other source, does not constitute cause for challenge. Rather it must appear that the prospective juror is *unable* to return a death sentence no matter what may be the facts of the case. Thus in *State v. Juliano,* 103 *N. J. L.* 663 (*E. & A.* 1927), the court said (*pp.* 670–671):

"The next point raised in sequence is that the court erroneously sustained the challenge made by the state to jurors whose scruples against capital punishment *precluded* their finding a verdict without recommendation for life imprisonment. * * * It was the right of the state to have jurors who would receive this contention *with open mind,* and when the jurors, upon their examination, disclosed that this phase of the case *could not* be so submitted to them they were obviously disqualified to pass upon one of the phases of the evidence as to which they might or might not exercise the clemency contemplated by the statute. *If sworn as jurors their scruples would shut out this proof and be in defiance of the law which submitted to them the proper punishment to impose on the defendants based upon the evidence solely."* (Emphasis added).

The same test applies if the bias is in favor of the death penalty and against life imprisonment. In *State v. Jefferson*, 131 *N. J. L.* 70 (*E. & A.* 1943), a challenge for cause was rejected, because although the juror believed everyone convicted of murder in the first degree should die, he nonetheless could recommend life imprisonment if there were mitigating circumstances. The court concluded "There is nothing to show that the juror challenged did not stand indifferent between the state and the accused" (*p.* 72). Thus, whether the bent of a juror is against or for capital punishment, he is not disqualified if he remains able to entertain the issue of penalty.

The practice in our State has been to probe under oath, *N. J. S.* 2A:78–4, a juror's claim of scruples to ascertain whether it thus disables him from discharging the statutory duty to decide what the punishment should be. Indeed, the efforts of the trial courts to test whether the juror's stand is truly disabling has led to the claims that defendants were hurt in the process. So in *State v. Rios*, 17 *N. J.* 572 (1955), it was charged that the trial court thereby suggested it wanted a death verdict. We found the charge to be unwarranted in fact, and in so doing we reiterated the definition of "cause" in terms which comport with *Witherspoon*, saying (17 *N. J.*, at *p.* 590):

"The questions objected to were obviously posed in an effort to elicit necessary information to enable the court to rule properly upon challenges made or contemplated. Nowhere can it be said that the court gave the impression that the jurors were under a moral obligation not to return a recommendation which would have meant the elimination of the extreme penalty. The questioning, rather, was directed to whether religious or moral scruples would *prevent* the individual jurors, *under any circumstances*, from deciding upon a verdict with the death penalty if the evidence so required. * * * Since the crime of which the defendants were accused carried the death penalty, the trial court could properly ascertain whether prospective jurors were *unable*, because of their scruples, to render a verdict requiring capital punishment." (Emphasis added.)

So, speaking of a complaint concerning the prosecutor's examination of the veniremen, we concluded (17 *N. J.*, at *p.* 592):

"* * * It was merely a proper probing within judicial limits to ascertain if their beliefs and convictions would *permit* the return of a verdict in accord with the present law of our State." (Emphasis added.)

The defendant in *State v. Mount*, 30 *N. J.* 195 (1959), similarly claimed, and prevailed upon the claim, that error occurred during the probing of the depth and dimensions of asserted scruples against capital punishment. A juror's claim was sought to be tested by inquiring whether he would feel the same way if the victim were a member of his family. When another juror asserted her opposition arose from the command of the Catholic faith, the trial court informed her the Catholic Church was not opposed to the death penalty. When the prosecutor asked a venireman: "in a proper case where the facts warrant and under the charge of the law by the court would you vote for a verdict of murder in the first degree, knowing that as a result of that verdict *the defendant would be put to death*," the trial court suggested the words we have italicized overstated the consequences since other events might intervene, such as a successful appeal, and that therefore the italicized words should be replaced by the proposition that "the defendant would receive the death sentence." This, defendant contended, diluted the jury's sense of full responsibility with respect to punishment. We held that although "the trial court's remarks during the *voir dire* were undoubtedly intended to test the strength of the juror's scruples against capital punishment and were not intended to influence them against the defendant" (30 *N. J.*, at *p.* 212), nonetheless the incidents just recounted added up to prejudicial error.

Thus *Rios* and *Mount* reveal plainly that a juror may not be excused for cause merely because of a qualm or a doubt or a bias or a scruple against capital punishment so long as

he is not prevented thereby from considering the issue of punishment. Recently we reaffirmed the holding in *Rios* that the critical question is "whether prospective jurors were *unable,* because of their scruples, to render a verdict requiring capital punishment" (italics added). *State v. Laws,* 50 *N. J.* 159, 184 (1967).

In the matter before us the trial court applied the concept of cause thus settled by our cases. The trial court itself questioned the veniremen on this topic. Each prospective juror was asked whether he held any religious, conscientious, or personal scruples or opinions in opposition to capital punishment which would render him unable to return a verdict carrying the death penalty. If the juror said he did, he was questioned further on the nature of his beliefs, and was finally confronted with the question whether his views were so firm and fixed that he was unable to return such a verdict in any case. A venireman who said he was thus unable to do so was excused for cause. So also, the trial court excused for cause a juror who was so firmly of the view that a murderer should die that he could not recommend life imprisonment. But a juror was not excused merely because he was opposed to capital punishment. Thus a juror (Williams), who admitted expressing doubts as to capital punishment, was permitted to serve because he said he was nonetheless able to return a death verdict. So another juror (Booth) was accepted despite an avowed reluctance to vote for such a verdict, and still another juror (Roehrich) who expressed an inclination toward life imprisonment, although ultimately challenged peremptorily by the State, was not excused for "cause."

Hence the jury was selected with the correct test in mind. We have examined the record to see whether the trial court nonetheless erred in its evaluation of the testimony of any of the veniremen. In doing so, we of course recognize that a layman's responses are frequently imprecise and that accordingly a trial judge must penetrate the verbal crust to decide whether the juror is truly able to consider the issue of

punishment. In that process the trial judge, who sees and hears the juror, is better situated than we, and hence we would not lightly disagree with his judgment. We add that although the defense asserted below that the inquiry should be confined to a juror's ability to adjudge *guilt,* rather than *punishment,* to which subject we will presently refer, the defense did not challenge any finding that a juror was unable to consider the penalty issue.

We find no error. We think the testimony of only a few veniremen need be discussed. One juror (Schnell), asked whether he was "unable in any case to vote for a verdict carrying with it capital punishment," said at first that he did not know, never having before been confronted with the question; then that "I am not sure, but I think so," *i. e.,* that he was unable in any case to vote for a death penalty; and finally that "I can't definitely say I could or I couldn't." He was excused for cause, and we think properly. The trial court did not state the precise basis of its ruling. It could have been that the juror was unable to consider the subject of penalty, a finding which such testimony would well warrant. But, if we accept literally the juror's final statement that he could not definitely say whether he was unable to vote for a death sentence, cause was nonetheless established. The State is entitled to a juror who is impartial, *i. e.,* one who is capable of considering whether the death sentence may be meet. Impartiality is a positive attribute. Its presence must appear affirmatively. If a juror, acknowledging racial, religious, or ethnic bias against an accused, is unable to say whether he could or could not judge the case on the merits, he is not an impartial juror. So here, the State is entitled to a juror who can at least assure the court that he will judge.[2]

---

[2] This seems implicit in the statement in *Witherspoon, fn.* 21, that "The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that may emerge in the course of the proceedings."

Another juror (North), asked whether she had any religious, personal or conscientious scruples "which would make you unable in any case to vote for a verdict carrying with it the death penalty," answered that "I feel it would be very difficult for me to make such a decision," and later that "Well, this is a very difficult thing for me to say. I really don't approve of taking another person's life under any circumstances. I think it would be very difficult"; and finally:

"Q. I want to know whether you have any such fixed belief that you would be unable to vote for a verdict carrying with it the death penalty in any case.
A. I think I would be unable to."

The juror was excused, and for the reasons we have given, we think properly.

Another juror (Hughes) said "There is some doubt in my mind," that "It's hard to explain. I've—I don't know really if I could, your Honor," and finally:

"Q. Well, do you have any such state of mind at the moment that you would be unable in any case to vote for a verdict carrying with it the death penalty?
A. Yes, I think I might be unable to."

Again for the reasons already given, the trial court correctly held the juror should be excused for cause.

### III

Although we find no error in the trial court's actions as to any venireman, we should add a word concerning the impact of an erroneous exclusion of a juror.

The usual rule is that a litigant cannot complain on appeal because a challenge for cause was *sustained*. The thinking is that if the jury as finally constituted was impartial, the right to a fair jury trial was satisfied notwithstanding that a prospective juror, who was also impartial,

was erroneously excused. The proposition is frequently stated in terms that the right of a defendant is "one of exclusion and not one of selection." *State v. Marchese,* 14 *N. J.* 16, 21 (1953); *State v. Deegan,* 133 *N. J. L.* 263, 268 (*E. & A.* 1945). And if a defendant did not exercise all of his peremptory challenges, that circumstance is usually noted, as a makeweight, to demonstrate that he thought the jury was satisfactory. *State v. Calabrese,* 107 *N. J. L.* 115, 118 (*E. & A.* 1930); *State v. Langhans,* 95 *N. J. L.* 213, 217 (*E. & A.* 1920).

▆▆▆ That rule is sound enough when the focus is merely upon a defendant's entitlement to a *particular juror.* In such a setting, that rule has been applied when the "cause" consisted of a juror's inability to consider the death penalty. *State v. LaPierre,* 39 *N. J.* 156, 173 (1963), *certiorari* denied, *Bisignano v. New Jersey,* 374 *U. S.* 852, 83 *S. Ct.* 1920, 10 *L. Ed. 2d* 1073 (1963); *State v. Juliano, supra,* 103 *N. J. L.,* at *p.* 671. But when the challenge goes beyond that limited issue and implicates the right to be tried by a jury which is *representative* of the community, it would be no answer to a systematic exclusion to say that the 12 jurors who decided the case were *individually* impartial. But see *United States v. Puff,* 211 *F. 2d* 171, 185, 186, *fn.* 2 (2 *Cir.* 1954), *certiorari* denied, 347 *U. S.* 963, 74 *S. Ct.* 713, 98 *L. Ed.* 1106 (1954); *Turberville v. United States,* 112 *U. S. App. D. C.* 400, 303 *F. 2d* 411, 419–420 (1962), *certiorari* denied, 370 *U. S.* 946, 82 *S. Ct.* 1596, 8 *L. Ed. 2d* 813 (1962). This must be so, for otherwise the right to a representative jury, as established in Witherspoon, could not be vindicated.[3]

▆▆▆ But where the trial court correctly understood the controlling principle, it does not follow that the erroneous exclusion of a single juror or any specific number of jurors

---

[3] The objection could not be raised on a challenge to the array when the process of exclusion occurs, not in the preparation of the jury panel or list, but rather at the trial itself.

must call for a reversal. Rather the question is whether the totality of the trial court's treatment of the subject operated to deprive the defendant of an opportunity for a jury of a representative quality. The thesis of *Witherspoon* is that persons who dislike capital punishment but are nonetheless capable of weighing the penalty issue constitute a segment of the community within the concept that a jury shall be drawn from a cross-section of the community. The erroneous exclusion of some jurors does not mean that the balance of the jury list was thereby deprived of representatives of that segment. Nor would it matter if no member of that segment in fact was selected. A defendant's right is to a fair opportunity to draw from all relevant segments, and unless the erroneous rulings amounted to a denial of that opportunity, the constitutional right was not infringed[4]. To hold otherwise would burden the judicial process with no demonstrable justification. And we think it correct to add that if the prosecution did not use all its peremptory challenges, that fact may be a relevant makeweight, for it is not unreasonable to assume that the remaining challenges would have been used, had the trial court ruled against the State on its objection to a specific juror. Here the State used only 7 of its 12 peremptory challenges. *N. J. S.* 2A:78-7; *R. R.* 3:7-2(c).

## IV

As we mentioned earlier, the only objection made by the defense at the trial was that the inquiry should be limited

---

4 In *fn.* 8 *Witherspoon* refers to *Smith v. State*, 55 *Miss.* 410 (*Sup. Ct.* 1877), to contrast the test of disqualification challenged in *Witherspoon* with the test used in that Mississippi case. In the quotation from the Mississippi case appears incidentially the statement that a new trial was ordered because two members of the venire were erroneously excluded. The opinion in the Mississippi case does not mention the problem we are discussing, and since the majority in *Witherspoon* refer to that case for a wholly different reason, we assume they did not thereby say that a new trial must be ordered if a trial court, aware of the correct concept, misapplies it with respect to two veniremen.

to the juror's ability to adjudge *guilt*. *Witherspoon* recognizes a right in the State to a jury impartial as to *penalty* and hence the propriety of a *voir dire* interrogation as to it. We, of course, may go beyond *Witherspoon* in construing our State Constitution. We are not, however, persuaded that we should. That proposal amounts to a call upon us to abolish capital punishment notwithstanding our statute. It must be plain that to bar inquiry as to the death penalty would, in practical terms, end capital punishment. If the statistics accepted in *Witherspoon* with respect to the extent of opposition to capital punishment (391 *U. S.* 510, 88 *S. Ct.* 1770, 20 *L. Ed. 2d* 776) are at all accurate, it should be virtually impossible, on that approach, to impanel a jury capable of agreeing unanimously upon a death verdict. *State v. Juliano, supra,* 103 *N. J. L.,* at *p.* 671. And if perchance a jury so selected did not contain a single member unalterably opposed to the death penalty, the luckless defendant could well complain that the imposition of the death sentence rested upon nothing more substantial than the spin of a wheel, and ask, on that account, whether the essence of due process or equal protection of the law was satisfied.

▪ Finally, we add a word concerning the further claim that men who have no unyielding scruple against capital punishment are conviction-prone. Unlike the proposition considered immediately above, which would bar any inquiry into the juror's views upon the death penalty, the point now under consideration would permit that inquiry. Indeed it would lead to that inquiry in every criminal case, for if a death-oriented juror is conviction-prone, he would be no more welcome in non-capital cases. Hence the defendant in every criminal charge could probe the venireman's views upon the death penalty, for even if such a juror were not excusable for cause, still he would be the worthy object of a peremptory challenge. Such is the reach of the proposition that he who believes in capital punishment is a convicting juror. True, a line might be attempted between the capital and the non-

capital case, but it could not withstand the inevitable pressures upon it.

 Witherspoon and Bumper rejected this challenge on the ground that the evidence on hand was too meager to establish its truth. And it may be doubted that the proposition can be established in terms which will compel acceptance. However useful psychological studies may be, even for experimental legislation, they are not likely to yield truths so clear and stable that the Constitution bows before them. The Constitution must not be read to choose between competing appraisals of human behavior.

The judgment is affirmed.

For affirmance—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, HALL and SCHETTINO—5.

For reversal—None.