(No. 38773, 40505 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* LY-MAN A. MOORE, Appellant.

*Opinion filed January 29, 1969.—Rehearing denied March 25, 1969.*

74

. WARD, J., took no part.
SCHAEFER, J., dissenting.

GERALD W. GETTY, Public Defender, RICHARD J. HOIKA, and WILLIAM H. HALL, all of Chicago, (JAMES J. DOHERTY, Assistant Public Defender, of counsel,) for appellant.

WILLIAM G. CLARK, Attorney General, of Springfield, and JOHN J. STAMOS, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and ELMER C. KISSANE and JAMES J. TRUSCHKE, Assistant State's Attorneys, of counsel,) for the People.

Mr. CHIEF JUSTICE SOLFISBURG delivered the opinion of the court:

In May, 1964, the defendant, Lyman Moore, was tried for the crime of murder. Following a jury trial in the circuit court of Cook County he was found guilty and sentenced to death. He appeals his conviction directly to this court contending that he was denied a fair trial and that he was not proved guilty beyond a reasonable doubt, and also appeals the denial of his petition for post-conviction relief.

On April 25, 1962, at approximately 10 P.M. two men were drinking in a tavern owned by Bernie Zitek in the village of Lansing, Illinois. One of these men began using profane language and, as a consequence, was forcibly removed from the premises by the owner. Present at this time were Patricia Hill, a waitress, and approximately seven other customers. One hour later a man rushed into the tavern, approached the bar, and shot Bernie Zitek in the chest with a shotgun, causing his death. The assailant immediately fled from the premises. Present at the time of the shooting were Patricia Hill and four customers who were playing cards at a table in the corner.

On October 31, 1962, a Chicago police officer was on patrol when the occupants of a 1957 Ford automobile shot at him and then fled from the car. The car was staked out by the police and the defendant and another man were arrested some time later as they were attempting to enter the car. The defendant and his companion were then taken to the Burnside Police Station. Later that night the defendant was placed in a line-up at the station at which time he was observed by Patricia Hill, the waitress at Zitek's tavern. It is not clear from the record whether an identification was made at this time or on the following day, November 1, 1962, when a second line-up was held at which time Mrs. Hill identified the defendant as the slayer of Zitek. Although several other persons viewed the line-up with Mrs. Hill, including at least two of the men who had been playing cards at the time of the shooting, only Mrs. Hill was able to identify the defendant as the assailant at this time. At the time of his trial, however, one of the customers who had been present at the shooting identified the defendant as the assailant.

The defense at the time of the trial was mistaken identity and alibi and defendant adheres to this defense in this appeal, and contends he was not proved guilty beyond a reasonable doubt.

In support of this contention defendant insists that the witness, Patricia Hill, was honestly mistaken. However, Miss Hill positively identified defendant, both in a police line-up and at the trial, as the man ejected from Zitek's tavern who returned to kill him. The lighting was good and she was only six feet from the defendant, and had ample opportunity to observe him earlier in the evening.

Henley Powell also testified at the trial positively identifying defendant as the man who shot Zitek. One Virgle Sanders testified that two days after the shooting he had a conversation in the Ponderosa Tavern with the defendant who told him that it was open season on bartenders, and

that he had just shot one in Lansing. Two other witnesses identified defendant as the same man with Sanders in the Ponderosa Tavern.

It is well settled that the positive identification of one witness, if credible, is sufficient to convict. (*People* v. *Brinkley,* 33 Ill.2d 403; *People* v. *Donald,* 29 Ill.2d 283.) The mere fact that others were present at a line-up and failed to identify the accused does not require reversal. *People* v. *Macias,* 39 Ill.2d 208.

We have carefully examined the evidence and considered the opportunity of the witness to observe and the discrepancies in the testimony and find that the identification of the accused was sufficient to justify a conviction. Defendant's eloquent argument concerning the inherent problems of human identification would be more appropriate if addressed to the trier of fact.

Upon all the evidence the jury was justified in finding defendant guilty beyond a reasonable doubt.

We next turn to alleged error which defendant claims occurred at the trial. As previously stated, defendant was arrested on October 31, 1962, six months after the crime, when police were shot at and later saw two subjects running from a car. The car was staked out for five or six hours and the defendant and another man were arrested when they again approached the automobile. The police arrested the defendant and found a .38 caliber revolver at defendant's feet, a shoulder holster on his person, and a .16 gauge shotgun in the back seat of the car. The .38 caliber revolver and the shoulder holster were marked as exhibits and the State sought to introduce them. The evidence was ruled inadmissible and the jury instructed to disregard it. The .16 gauge shotgun was admitted into evidence although it was not positively identified as the death weapon.

Defendant claimed that he was prejudiced by the evidence of the circumstances of his arrest, the display of the revolver and shoulder holster, and the admission of the

shotgun into evidence. We do not agree. We think that despite the length of time between the crime and the arrest, testimony regarding the circumstances of the arrest was admissible, including testimony relating to the weapons found in defendant's possession or control at the time of the arrest. (*People* v. *Wright*, 30 Ill.2d 519; *People* v. *Anderson*, 17 Ill.2d 422; *People* v. *Davis*, 14 Ill.2d 196; *People* v. *Jackson*, 9 Ill.2d 484, 492; *People* v. *Smith*, 413 Ill. 218; *People* v. *Durkin*, 330 Ill. 394.) Since possession of the revolver and shoulder holster were proper areas of testimony, and the items were not admitted into evidence and the jury was instructed to disregard them, we find no reversible error. (*People* v. *Holt*, 28 Ill.2d 30; *People* v. *Carvin*, 20 Ill.2d 32; *People* v. *Prohaska*, 8 Ill.2d 579.) There is no clear evidence of the weapon actually used in this homicide, although it is clear that it was a shotgun. We have consistently held that a weapon found upon a defendant suitable for the commission of the crime charged is proper evidence even though there is no showing that it was the actual weapon used. *People* v. *Magby*, 37 Ill.2d 197; *People* v. *Ostrand*, 35 Ill.2d 520; *People* v. *McCasle*, 35 Ill.2d 552; *People* v. *Lenhardt*, 340 Ill. 538.

The defendant further contends that the cross-examination of the two identifying witnesses, Patricia Hill and Henley Powell, was unduly restricted. We have carefully examined the testimony of both Hill and Powell and their cross-examinations and the rulings on objections to the cross-examinations, and we find no evidence that the trial judge abused his discretion in restricting it to matters which explained, modified or discredited earlier testimony. *People* v. *Welch*, 22 Ill.2d 558, 560; *People* v. *Moretti*, 6 Ill.2d 494.

It is also argued that the prosecutor's closing argument was prejudicial in that he accused defense counsel of making a statement that was not true and stated that one of the witnesses was "scared to death" of the defendant. The latter remark was promptly stricken and the jury instructed

to disregard it. We have examined the prosecutor's remarks regarding the misstatements of defense counsel and, while we consider them inappropriate, they were in response to equally inappropriate remarks of the defense. In examining the arguments as a whole we find no reversible error.

The last contention of the defendant concerning trial error regards an alleged oral instruction to the jury. The jury was given complete written instructions as requested and tendered by both the prosecution and the defendant fully covering the case, and the trial court further stated to the jury orally: "Now, in a murder case, the jury has the duty to determine first whether the defendant is guilty or not guilty. If you decide he is not guilty that ends the case. If you decide he is guilty of murder then you must next determine whether or not you wish to return a verdict of death. If you decide on a verdict of death you will so indicate in your verdict. If you have determined the guilt of the defendant and decide against a verdict of death you will return a verdict of guilty and the Court will fix the term of punishment."

While it is true that we have earlier held that instructions to a jury in a criminal case must be written, (*Ellis* v. *People,* 159 Ill. 337,) this does not prevent a trial judge from making a brief explanatory statement of the forms of verdict that in no way contradicts the written instructions. We do not believe that this brief statement given here amounted to an oral instruction by the court and it clearly could not have prejudiced the defendant. *People* v. *Lamphear,* 6 Ill.2d 346; *People* v. *Bydalek,* 381 Ill. 330.

Having examined the complete record in this case it is our conclusion that the defendant received a fair trial and that the evidence adduced justified the jury verdict finding him guilty beyond a reasonable doubt.

We next consider defendant's contention relating to his post-conviction petition. The gist of the allegations in the petition are that there was an unconstitutional concealment

of evidence by the State and there was knowing use of perjured testimony by the prosecution. The alleged concealment involves police efforts to locate a man named "Slick". Virgle Sanders identified the man at the bar in the Ponderosa Tavern as a man he knew only as "Slick". It appears from the post-conviction hearing that in the course of the lengthy police investigation the police questioned a certain William Thompson who knew a "Slick", but he failed to identify Moore as the man he knew as "Slick". There was also a raid by the Lansing police on Wanda and Dell's Tavern in an attempt to find "Slick". Delbert Jones, the owner of the tavern, said he knew a "Slick" and could identify him but he was not there. After Moore was arrested the police did not contact Delbert Jones for identification and defense counsel were not informed about the raid on Wanda and Dell's Tavern at the time of trial. It also appears that the Lansing police had the name of a James E. Watts in their files who was known as "Slick". There is no evidence, however, that James E. Watts was the man who talked to Virgle Sanders or was in the Ponderosa Tavern.

None of the items allegedly concealed by the prosecution were requested by the defendant during the trial. It is clear that in a post-conviction hearing the burden is upon the defendant to show a denial of a constitutional right by a preponderance of the evidence (*People* v. *Evans,* 37 Ill.2d 27), and the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material. (*Brady* v. *Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.) We have examined the record on the post-conviction hearing and we do not believe that the defendant has shown by a preponderance of the evidence that the prosecution suppressed material evidence favorable to the accused which had been requested by the accused. The record discloses that the assistant State's Attorney at the trial showed his entire file to the defense attorney and no further request for disclosure was

made. To sustain defendant's contention would be to require the prosecution to fully report every detail of lengthy police investigation including the following up of useless leads and discussions with immaterial witnesses. We conclude that defendant was deprived of no constitutional right because of any suppression of evidence by the prosecution.

Defendant next contends that the testimony of Virgle Sanders and Henley Powell was perjured and knowingly used by the prosecution. We find nothing in the record to clearly indicate that the testimony of either Sanders or Powell was perjured and certainly it does not appear that any error in the testimony was known to the prosecution. Sanders testified that the defendant was the man he knew as "Slick". Even though it appears that he said he had met Slick at a time that Moore was in fact in prison, and that other people did not know Moore as "Slick", and the fact that Sanders had first stated that the man he knew as "Slick" was about 30 or 40 pounds heavier than Moore does not indicate perjury, but mere testimonial inconsistency. The only argument as to Powell's testimony was that it is contradicted by one of the defense witnesses, Donald O'Brien, and there was evidence that Powell was mistaken as to which direction he was facing at the card table when he viewed the defendant. Such contradictions in testimony go to the weight of the evidence and do not in any way indicate perjury. We therefore conclude that there was no such use of perjured testimony at the trial as to deny the defendant his constitutional rights, and the post-conviction petition was properly denied.

After the oral argument of this case the United States Supreme Court in *Witherspoon* v. *Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, held exclusion of jurors simply on the ground that they had scruples on capital punishment, without further inquiry to determine whether the juror could vote to inflict a death sentence, deprives a defendant of his right to a trial by a fair and impartial jury.

On *voir dire* in this case each juror was asked in substance: Do you have any religious or conscientious scruples against the infliction of the death penalty in the proper case? Twelve jurors positively asserted that they had such scruples and were excused for cause without motion by the State or objection by the defendant.

The tenor of the entire examination, however, was unlike *Witherspoon* where the trial court promptly removed all who expressed the slightest qualms about capital punishment. The effort of the court to select a fair and impartial jury is indicated by the examination of prospective juror Conner:

"THE COURT: Q. Did you say Mr. Conner, that if you determine first, that the defendant is guilty and then you are to determine whether you should render a verdict of death that you couldn't consider that?

A. I said that I was one hundred percent for punishment, but if a man has to take another life to punish him, then I don't feel that I could be justified in taking it.

Q. In other words, you don't believe in capital punishment.

A. If that's what it amounts to.

Q. No, no. I'm asking you. I asked you, did you have any religious or conscientious scruples against the infliction of the death penalty in a proper case?

A. In a proper case, no, I don't have any objections and I could sign a death penalty in a proper case.

THE COURT: Well, I'm not going to remove him."

The court also conducted the following examination of prospective juror Nakata:

"Q. Likewise, you can't be a juror unless you, when you're sworn, and you are sworn to respect and observe the law.

A. That's the reason why I would like to give my

reasoning right now, before I perjury myself about that personally, because I can't go all the way on capital punishment.

Q. You can't go all the way?

A. No.

Q. Where do you stop?

A. It depends on the kind of crime it is and the evidence presented for it.

Q. Oh, that's all we are asking you to do.

A. Well, it seems to me, from the statements made by the prosecuting attorney, that he is going to ask for the death penalty, so, in view of that fact, I think I should disqualify myself.

Q. If he asks for it, it doesn't mean that you have to give it to him.

A. Of course, that's true, too. But, at the same time, though, I mean, I wouldn't be applying the law, as he stated it, you see, upon his presentation of the evidence, and all that, so I don't think I would be fair to the court or to the rest of the jurors by my being on the jury.

THE COURT: Step down, then, if you don't think you can be fair. I'm not going to ask you to try any further. The only question is, we want you to be fair and impartial."

In *People* v. *Speck,* 41 Ill.2d 177, we held that the exclusion of jurors with scruples against the death penalty did not necessarily void the infliction of the death penalty. We there said: "The circumstances under which the *voir dire* examination here was conducted were quite different from those in *Witherspoon.* In that case the court noted that the tone was set when the trial judge said early in the *voir dire,* 'Let's get these conscientious objectors out of the way without wasting any time on them.' In this case there was no hint of a desire for haste or for a perfunctory examination to see how many jurors could be disqualified on

the statutory basis alone. On the contrary, the tone of the proceedings here indicated a sincere desire on the part of the prosecutor and the court (although perhaps not shared by the defense) to determine the jurors' qualifications according to the standard later held acceptable in *Witherspoon.*"

It is also clear that in this case the State had sufficient peremptory challenges to have eliminated those prospective jurors eligible to serve under *Witherspoon.* We conclude that, because of the tenor of the examination and the availability of peremptory challenges, *Witherspoon* does not apply. See *People* v. *Mallett,* No. 39071.

We stated in *Speck*: "Whether one accused of crime has been afforded due process is not to be determined by inquiring as to whether certain formal language has been used; rather, the inquiry is whether the defendant has received a fair trial. We are satisfied that the court exerted every effort to insure the defendant's right to a trial by a fair jury, and we hold that the exclusion of certain jurors who stated that they had conscientious scruples against capital punishment did not deny the defendant a fair trial. See *State* v. *Mathis,* 52 N.J. 238, 245 A.2d 20, 27."

We have fully considered the numerous contentions advanced by the defendant and are of the opinion that his guilt was established beyond a reasonable doubt and that he received a fair trial. The judgments of the circuit court of Cook County are affirmed. The clerk of this court is directed to enter an order fixing Friday, March 28, 1969, as the date on which the original sentence of death entered in the circuit court shall be executed. A certified copy of this order shall be furnished by the clerk of this court to the sheriff of Cook County.

*Judgments affirmed.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.

Mr. JUSTICE SCHAEFER, dissenting:

The case against the defendant consisted of the following: (1) The identification of the defendant by the waitress, Patricia Hill, as the ejected customer who returned to the tavern and shot Bernie Zitek. (2) The identification of the defendant, by Henley Powell, as the man who came into the tavern and shot Bernie Zitek. Powell had not been in the tavern when the customer was ejected. (3) The identification of the defendant by Virgle Sanders as the man, nicknamed "Slick", who bragged of having shot a bartender in Lansing. Two other witnesses testified that the defendant was present in the Ponderosa Tavern at the time of the alleged bragging to Sanders, although they did not hear it.

The trial judge sustained prosecution objections to questions put to Patricia Hill as to when she had next seen the defendant after the date of the murder. The questions were clearly designed to elicit the circumstances under which she had identified the defendant. The objections were sustained on the ground that the questions went "beyond the examination in chief." Similarly, objections to the efforts of the defense to ascertain the circumstances of the initial identification of the defendant by Henley Powell were sustained. These rulings were erroneous, for the circumstances of an identification clearly relate to its weight. With regard to Patricia Hill, the prosecution attempted to cure the error by eliciting from her on rebuttal the fact that she had viewed lineups on October 31, 1962, and on November 1, 1962. So far as Henley Powell was concerned, the prosecution made no attempt to correct the error.

Donald O'Brien testified that the defendant was not the man ejected from Zitek's tavern. O'Brien was playing cards with Henley Powell and others when the shot was fired. His back was to the bar and the door and he did not see the killer, although he ran out the door after him. O'Brien also testified that Patricia Hill was the only one of 7 persons who had been in Zitek's tavern that night who identified

the defendant in the November 1, 1962, line-up. None of those other persons, including the other participants in the card game, was called as a witness.

The defense presented the uncontroverted and unimpeached alibi testimony, unmentioned in the majority opinion, of the head bartender and the general manager of the Westmoreland Country Club in Wilmette. Both testified, and the employment records of the Club showed, that the defendant was employed as a cocktail waiter until after midnight on the night of April 25, 1962, the date of Zitek's murder. He was paid overtime for that work.

On this record, in view of the strong alibi evidence, the testimony of O'Brien, the successful effort of the prosecution to conceal the circumstances under which its witnesses first identified the defendant and the failure of the prosecution to account for those who did not identify the defendant, I am unable to conclude that the defendant's guilt was established beyond a reasonable doubt.

I am also unable, for several reasons, to agree with the majority that the 16-gauge shotgun seized at the time of the defendant's arrest was properly admitted into evidence. In the cases cited by the majority no ballistic evidence was available, and therefore the suitability of the weapon for the commission of the crime charged could be established only by a physical description. In this case, however, the prosecution had ballistic test results in its possession throughout the trial which showed that Zitek was shot with a 12-gauge shotgun. The shotgun received in evidence was thus as unsuitable for the commission of this murder as was the excluded .38 caliber revolver. Furthermore, the ballistic evidence was admitted by stipulation only at the close of the defendant's case, after the prosecution had persistently resisted defense attempts to bring it out and after the shotgun had been received in evidence. Finally, there was no proof that the shotgun was in the possession or control of the defendant. It was discovered 6 months after the com-

mission of this crime in a car that belonged to someone other than the defendant. No use of, or access to, that car by the defendant was shown. Under identical circumstances this court reversed another death sentence, saying, "We have found no case upholding the admission into evidence of weapons not proved to be in the possession or under the control of the defendant." (*People* v. *Smith,* 413 Ill. 218, 221.) That ruling should be applied in this case.

At the post-conviction hearing the defendant introduced a statement that Virgle Sanders had given to the Lansing police on April 30, 1962, in which Sanders stated that he had met "Slick" "about six months ago." The defense did not learn of that statement until after the trial. When confronted at the post-conviction hearing with the fact that the defendant had been incarcerated in a Federal penitentiary until March 4, 1962, Sanders admitted that it was impossible that the defendant was the man who had bragged that he had shot the bartender. The F.B.I report which showed the date of the defendant's release from Leavenworth was received by the Lansing police officers shortly after the defendant's arrest and was in their possession throughout the trial. Sanders' identification was further impugned by the fact that he did not see the defendant again after his alleged encounter with "Slick" until the day of the trial some 25 months later. At that time, when he first saw the defendant, he stated that "the guy that I knew as Slick looked to me to be about thirty or forty pounds heavier * * * and he didn't wear glasses." He testified that one of the officers replied, "Well, you know how jailhouse beans are."

Sanders testified at the post-conviction hearing that he remembered "Slick" as the man he knew from Wanda & Dell's Tavern who nearly became involved in a fight with a Willie Thompson. William Thompson also testified at the post-conviction hearing. He was acquainted with a "Slick" from Wanda & Dell's Tavern and was involved in the altercation mentioned by Sanders. In early November of 1962

the Lansing police showed him a number of photographs, including one of the defendant, but he was unable to identify any of them as the "Slick" that he knew. He was never called to view a line-up or to testify at the defendant's trial. Subsequent to the trial, Thompson was shown a series of photographs of James E. ("Slick") Watts which he identified as photographs of the "Slick" he knew.

At the post-conviction hearing it was also brought out that on April 30 or May 1, 1962, the Lansing police had staged a raid of Wanda & Dell's Tavern in search of "Slick." Delbert Jones, the owner, testified that he then told the police that he could identify the "Slick" who frequented his tavern, but he was never contacted for that purpose. Jones testified that he had been shown a picture of the defendant and that the defendant was not "Slick". At the post-conviction hearing he identified a photograph of "Slick" Watts as the "Slick" who had frequented his tavern.

During the entire investigation of the Zitek murder the Lansing police suspected "Slick" Watts as the assailant and assigned a lieutenant to search for him. Thus there is convincing evidence that the defendant is not the man who had bragged to Sanders, and despite the majority's assertion to the contrary, there is substantial evidence that "Slick" Watts, and not the defendant, was that man. None of this exculpatory evidence was disclosed to defense counsel.

The defendant's conviction rests entirely upon identification testimony. The facts developed at the post-conviction hearing seriously impeached, if indeed they did not destroy, Sanders's trial testimony. Had those facts, and the identifications of "Slick" Watts by Thompson and Jones, been available at the trial, the jury may well have been unwilling to act upon the identifications of Patricia Hill and Henley Powell. Far more is involved in this case, in my opinion, than "the following up of useless leads and discussions with immaterial witnesses." Certainly if Sanders's identification was material, the F.B.I. report and the testimony of the

other witnesses which destroyed that identification were also material. Consequently, I believe that the State's nondisclosure denied the defendant the fundamental fairness guaranteed by the constitution. *Brady* v. *Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194; see *United States* v. *Wilkins* (2d cir. 1964), 326 F.2d 135.

The majority, however, disposes of this issue upon the ground that the defendant failed to request the evidence which was suppressed. This ground is neither factually nor legally sound. Prior to the trial the defendant had demanded copies of the grand jury minutes and of all statements made to the Lansing police. The motion was allowed only to the extent of providing the defendant with the statement of each witness who testified at the close of his direct examination. No statement of Virgle Sanders was supplied. Although, as the majority points out, the prosecuting attorney offered his file to the defense at the trial, that attorney was unable to recall whether the items here involved were in that file. The defendant's attorney testified that none of these items was disclosed to him.

Moreover, despite the language in *Brady* v. *Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, I do not believe that the Supreme Court intended to establish a request as an indispensable prerequisite to disclosure by the prosecution. Prior to *Brady* many courts had recognized the duty of the prosecution to disclose favorable, material evidence to the defense. And in many of those cases the defense did not know of the evidence and so had failed to request it. (*Mooney* v. *Holohan*, 294 U.S. 103, 79 L. Ed. 791, 55 S. Ct. 340; *Pyle* v. *Kansas*, 317 U.S. 213, 87 L. Ed. 214, 63 S. Ct. 177; *United States* v. *Dye* (3d cir. 1955), 221 F.2d 763; *United States* v. *Baldi* (3d cir. 1952), 195 F.2d 815.) In *Brady* the Supreme Court acknowledged the long-standing duty that rested upon the prosecution. In doing so, it used language appropriate to the decision of the case before it. Without an explicit holding to the contrary, I cannot believe

that the Supreme Court intended to narrow the duty of the prosecution as it had existed prior to *Brady* by making that duty contingent upon a request when the defense is ignorant of the existence of the suppressed information. Essential fairness, rather than the ability of counsel to ferret out concealed information, underlies the duty to disclose. *Brady* v. *Maryland*, 373 U.S. 83, 10 L. Ed. 215, 83 S. Ct. 1194; *Barbee* v. *Warden, Maryland Penitentiary* (4th cir. 1964), 331 F.2d 842; *United States* v. *Wilkins* (2d cir. 1964), 326 F.2d 135.

Whether or not the prosecuting attorneys were aware of the existence of the withheld evidence in the files of the Lansing police department is immaterial, for the prejudice to the defendant is identical whether the evidence is withheld by the prosecutor or by the police. What was said by the United States Court of Appeals for the Fourth Circuit in *Barbee* v. *Warden, Maryland Penitentiary*, 331 F.2d 842, is applicable here: "Nor is the effect of the nondisclosure neutralized because the prosecuting attorney was not shown to have had knowledge of the exculpatory evidence. Failure of the police to reveal such material evidence in their possession is equally harmful to a defendant whether the information is purposely, or negligently, withheld. And it makes no difference if the withholding is by officials other than the prosecutor. The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure. If the police allow the State's Attorney to produce evidence pointing to guilt without informing him of other evidence in their possession which contradicts this inference, state officers are practicing deception not only on the State's Attorney but on the court and the defendant. 'The cruelest lies are often told in silence.' If the police silence as to the existence of the reports resulted from negligence rather than guile, the deception is no less damaging. The duty to disclose is that of the state, which ordinarily acts through the prosecuting

attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused. We cannot condone the attempt to connect the defendant with the crime by questionable inferences which might be refuted by undisclosed and unproduced documents then in the hands of the police."