Ronald Thomas KOONCE, Plaintiff in Error,

v.

The STATE of Oklahoma, Defend-
ant in Error.

No. A–14826.

Court of Criminal Appeals of Oklahoma.

May 21, 1969.

Rehearing Denied July 9, 1969.
Second Rehearing Denied July 29, 1969.

O. A. Cargill, Jr. and Stanley Pierce, Oklahoma City, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Dale Crowder, Asst. Atty. Gen., John L. Clifton, Dist. Atty., Paul Vassar, Asst. Dist. Atty., for defendant in error.

BUSSEY, Judge.

This is an appeal from the District Court of Lincoln County, State of Oklahoma, wherein the plaintiff in error, Ronald Thomas Koonce, hereinafter referred to as defendant, was tried and convicted of the crime of Murder and sentenced by the jury to suffer the penalty of death. Judgment and sentence was pronounced in accordance with the verdict of the jury on De-

cember 28, 1967, from which defendant has perfected this appeal.

The record reflects that during the early morning hours of June 10, 1967, Mrs. Verle (Betty) McCullough and her sister, Mary Alice Valliquette, were found brutally murdered in Mrs. McCullough's home, located in the community of Stroud, Lincoln County, Oklahoma. Defendant was arrested at his home in Stroud on June 13, 1967, and taken to the county courthouse where, after being advise of his rights, he was questioned and gave a statement admitting that he had committed the murders. Defendant was arraigned on this same day, after being advised of his rights, waived preliminary hearing, and was bound over for trial in the District Court. On June 27, 1967, upon application of the District Attorney, the defendant was committed to the Eastern State Hospital at Vinita, Oklahoma, for a period not to exceed ninety (90) days mental observation and examination, with the examining physician to report to the court on the sanity of the defendant. The examining physician reported defendant to be mentally competent to stand trial. Upon application of defense counsel, the case was remanded to the County Court of Lincoln County on June 16, 1967, for a preliminary hearing. Said preliminary hearing was conducted on October 19, 1967, and the defendant was bound over to stand trial on the charge in the District Court. On December 4, 1967, the cause was called for trial.

Testimony at the trial indicates that Mrs. McCullough's six year old son, who, along with a five year old and eighteen-month old sister occupied the home, confronted some neighbors who proceeded to the McCullough home and found the nude, bloody bodies of Betty McCullough and Mary Alice Valliquette. The neighbors then summoned the police.

The post-mortem examination of Mrs. McCullough was performed by Dr. Leo Lowbeer on June 12, 1967, 'and 'revealed that the deceased had been severely beaten, her skull fractured, and stabbed nine times.

The examination also revealed the presence of a great deal of sperm in the sex organs of Mrs. McCullough. The examination of the body of Mary Alice Valliquette also revealed extensive beating, skull fracture, and nine stab wounds.

Defendant's companions on the night of the crime, Eddie Dean Ferguson, James Edward Stubbs, Jr., and Marvin Dale Howard, testified as to the occurrences on the night in question. It appears that after an evening of considerable beer and vodka drinking, this group proceeded to the McCullough home in Howard's car driven by the defendant. Parking the car about 100 yards in the back of the home, the defendant left the others and entered the home with a 22 semi-automatic rifle. The defendant was seen in the home, along with part of the rifle, through a window, by his companions. After approximately twenty minutes defendant left the home covered with blood and with pieces of the rifle and two knives. Defendant then drove the group to the Deep Fork River where he disposed of the rifle pieces and knives, washed off the blood, and left his shirt which was later recovered by the police.

There was other testimony offered for the State regarding the defendant's fingerprint found at the scene of the crime and human blood found on the jeans of the defendant. Defendant's companions, Howard and Ferguson, also testified that they had entered pleas of guilty to the crime of Accessory After the Fact of Murder and received five year suspended sentences. The defendant did not take the stand but his attorneys and mother did testify regarding defendant's background, conduct, and mental attitude. After hearing the evidence and argument of counsel, the jury returned a verdict of guilty and assessed the penalty at death.

On appeal it is defendant's first proposition that he was denied a trial by an impartial jury as required by the Sixth and Fourteenth Amendments of the United States Constitution because of the voir dire examination of prospective jurors as

to whether they could vote for the death penalty. Defendant contends that such voir dire examination results in a jury which does not reflect a true picture as to the community's feelings regarding the penalty for the crime of Murder, and that such an examination emphasized the death penalty. Defendant concludes that former decisions of this Court allowing the disqualification of prospective jurors who had conscientious scruples against imposing the death penalty have been overruled and that "it is mandatory that this Court set aside and hold for naught the judgment and sentence of this trial court and to remand this cause * * * to abide by the decision of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)."

The decision in Witherspoon v. Illinois, supra, has been the subject of much confusion and comment far in excess of its actual effect. Thus, it is well to examine the holding of the United States Supreme Court in Witherspoon for its precise holding and application. In Witherspoon the Supreme Court held:

> "The issue before us is a narrow one. It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt. Nor does it involve the State's assertion of a right to exclude from the jury in a capital case those who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them. For the State of Illinois did not stop there, but authorized the prosecution to exclude as well all who said that they were opposed to capital punishment and all who indicated that they had conscientious scruples against inflicting it." 391 U.S. at 513, 88 S.Ct. at 1772, 20 L.Ed.2d, at 780.

The court noted in footnote 7 as follows:

> "It is entirely possible, of course, that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State." 391 U.S. at 514, 88 S.Ct. at 1773, 20 L.Ed.2d, at 781.

The actual holding by the court in Witherspoon was as follows:

> "Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding venirement for cause simply because they voiced *general objections* to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522, 88 S.Ct. at 1777, 20 L.Ed.2d, at 784 [Emphasis ours].

In examining the Witherspoon decision it is well to note what the court *did not* hold:

> "We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*." Footnote 21. 391 U.S. at 522, 88 S.Ct. at 1777, 20 L.Ed.2d, at 785 [emphasis ours]

In the body of its opinion the Court held:

> "We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of con-

viction." 391 U.S. at 518, 88 S.Ct. at 1775, 20 L.Ed.2d, at 782.

In a more recent decision the United States Supreme Court had an opportunity to amplify its decision in Witherspoon. In Boulden v. Holman (decided April 2, 1969) 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed. 2d 433, the Supreme Court, without making a final disposition, indicated that it was error for an Alabama trial court to excuse for cause prospective jurors simply on the basis of their affirmative answer to the question whether, in the statutory language, they had a "fixed opinion against" capital punishment. The Supreme Court held that:

"Yet it is entirely possible that a person who has 'a fixed opinion against' or who does not 'believe in' capital punishment might nevertheless be perfectly able as a juror to abide by existing law—to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case." 394 U.S. 483, 89 S.Ct. at 1141, 22 L.Ed.2d, at 438.

In Boulden the court referred to its decision in Witherspoon as follows:

" 'The most that can be demanded of a venireman in this regard,' we said, 'is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. * * *' We made it clear that '[u]nless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position.' "

We thus observe the critical question necessary before a prospective juror can be excused on a challenge for cause is whether in a proper case they would consider or agree to a verdict which imposes death as the penalty. Mere opposition to the death penalty, whether it arises from a religious or conscientious scruple, or any other source, does not constitute cause for challenge. Rather it must appear prospective jurors are unable to return a death sentence no matter what may be the facts of the case. As was observed by the Supreme Court of New Jersey in State v. Mathis, 52 N.J. 238, 245 A.2d 20:

"The thesis of Witherspoon is that persons who dislike capital punishment but are nonetheless capable of weighing the penalty issue constitute a segment of the community within the concept that a jury shall be drawn from a cross-section of the community." 245 A.2d, at 27.

Thus, it would appear, contrary to the contention of the defendant, that Oklahoma law in this regard is not out of keeping with the holdings of the United States Supreme Court. The Oklahoma Statute providing for a challenge for cause of prospective jurors regarding the imposition of the death penalty, is 22 O.S. 1961, § 660, and provides as follows:

"A challenge for implied bias may be taken for all or any of the following cases, and for no other:

\* \* \* \* \* \*

8. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty of, in which case he shall neither be permitted nor compelled to serve as a juror."

The Oklahoma Statute is quite different from the Illinois Statute involved in the Witherspoon decision which provided that a prospective juror shall be disqualified if he states "he has conscientious scruples against capital punishment, or that he is opposed to the same." [1] We note in comparison that the corresponding Nevada Statute, N.R.S. 175.105(9), is identical to the Oklahoma Statute with the exception of two words, and in Howard v. State,

1. Ill.Rev.Stat.1959, c. 38, § 743.

Nev., 446 P.2d 163 (1968), the Nevada Supreme Court held in an analogous situation:

"In any event, the rationale of Witherspoon is inapposite to the Nevada statute since the statutory purpose is to disqualify jurors whose opinions against the death penalty would preclude their finding the defendant guilty. The Illinois statute considered in Witherspoon did not involve the right to challenge for cause those prospective jurors who stated that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt." 446 P.2d, at 165.

Likewise, we do not find the pre-Witherspoon decisions of this Court to be inconsistent with the Supreme Court's holding. In Application of Sharp, Okl.Cr., 414 P.2d 720 (1966), this Court held:

" * * * we have repeatedly held that 22 O.S.1961, § 660 requires a juror's removal for cause if he has conscientious opinions concerning capital punishment that would preclude his finding the defendant guilty. * * *" 414 P.2d, at 722.

In Cardwell v. State, 20 Okl.Cr. 177, 201 P. 817 (1921), we held:

"But the conscientious scruples or opinions sufficient to disqualify a juror in a murder case under our statutes must be such as would preclude him from agreeing to a verdict of guilty with the death penalty attached." 201 P., at 818.

In keeping with the Witherspoon decision, it is apparent that the State is entitled to a jury which is neutral on the subject of penalty and it may challenge for cause a juror who would never consider returning a verdict of death. It is clear that the State is still entitled to a jury that is capable of imposing the death penalty. Witherspoon v. Illinois, 88 S.Ct., at 1776; New Jersey v. Madden, 245 A.2d at 23.

The Oklahoma practice has been, as it is in the instant case, to inquire into a prospective juror's claim of scruples to ascertain whether it thus disables him from discharging the statutory duty to decide what the punishment should be. From a careful review of the voir dire examination of the jury in the instant case, we find that it was selected with the correct test in mind. Nowhere in the record herein does it appear that the trial court excused veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against infliction of the death penalty. Rather, it is clear that the prospective jurors excused for cause due to their belief regarding the death penalty, were those who could not agree to a verdict imposing the death penalty. In the instant case 83 veniremen actually reported for jury duty. Of these, 78 were actually selected to sit in the jury box at one time or another. Of these 78, 22 were excused upon the State's challenge for cause by the court because they indicated they could not return a verdict imposing the death penalty. (See Appendix: Questioning of Jurors Excused Because They Would Not Impose Death Sentence). The essential question, with some variations, asked by the prosecuting attorney herein was:

"In a case where the law and the evidence warrant, in the proper case, could you without doing violence to your conscience agree to a verdict imposing the death penalty?"

Each of the 22 prospective jurors excused on challenge for cause regarding the death sentence gave a negative response to this inquiry. From the examination of the veniremen it is thus apparent that the prospective jurors were not being excused merely for conscientious scruples, but because they indicated that such scruples would prevent them from agreeing to a verdict imposing the death penalty regardless of the evidence or law. The prospective jurors were dismissed because they would not even consider returning a verdict of death and not merely because they, as many civilized men, felt a reluc-

tance to impose capital punishment. We do not find it material that the prospective jurors excused for cause did not state under examination that they would not vote for the death penalty "in any case." The questioning herein which reveals that they would not have agreed in a proper case to a verdict imposing the death sentence is sufficient. In Pittman v. Texas, 434 S.W.2d 352 (1968), the Texas Court of Criminal Appeals in a similar situation held:

"The fact that one or more veniremen may have been excused on the challenge for cause without a full showing that they would not in any case vote for the death penalty does not mean that the jury was chosen by excluding the veniremen for cause simply because they voiced general objections to the death penalty or that the state 'stacked the deck' against appellant." 434 S.W.2d, at 683.

■ We therefore conclude that the defendant's contention that the voir dire examination of the jury regarding the imposition of the death penalty denied him a fair and impartial trial, is without merit. We are of the opinion that the examination of prospective jurors herein was consistent with the requirements of the Sixth and Fourteenth Amendments of the United States Constitution as defined in Witherspoon v. Illinois, supra, by the United States Supreme Court.

Defendant argues two additional propositions regarding the selection of the jury (Propositions V and VI) which we will consider at this time. Defendant contends that the trial court erred in overruling his Motion for Change of Venue and Motion to Hold the Cause in Abeyance by reason of adverse publicity. In support of his Motion for Change of Venue, defendant attached a scrapbook containing newspaper articles from papers with circulation in Lincoln County, which related to the crime and defendant's trial, as well as affidavits from county citizens stating that they had learned from the news media of defend-

ant's being charged with the crime. The State, in rebuttal to defendant's Motion, offered affidavits of citizens of the community stating that they believed the defendant could receive a fair trial in Lincoln County, and pointed out numerous newspaper articles which had been generated by the defense counsel's own statements to the press, and pointed out that many of the articles were relative to court procedure rather than defendant or the evidence against him.

The trial court, in ruling that the affidavits and newspaper clippings offered by defense counsel, were insufficient to convince the court that defendant could not receive a fair trial in Lincoln County, noted:

" * * * that this offense is alleged to have happened on the 10th of June, which was some six months away—I also notice a good many press clippings reported to give any facts of the murder or might in any way be prejudicial, were those that were reported immediately at the time of the happening of the crime, and the Court is not of the opinion that there is such a feeling at this time, nor has there ever been since the event in question, that would prevent the defendant from having a fair trial * * * *"

■ Defendant in support of his proposition has cited the single case of Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). This court has previously applied the Sheppard decision where defendant contended he did not receive a fair trial by virtue of adverse pre-trial publicity in Shapard v. State, Okl.Cr., 437 P.2d 565 (1967), where this Court held in the sixth and seventh paragraphs of its syllabus:

"Mere fact that prospective jurors have read newspaper or other publicity items critical of defendant does not, by itself, establish bias, pre-judgment, or other disqualification on part of prospective jurors, and does not entitle defendant

to postponement of trial for indefinite or substantial period of time.

Where there has been widespread adverse pretrial publicity about defendant, proper procedure in vast majority of cases is not to postpone trial indefinitely or for substantial period of time, but to proceed to trial and to determine on voir dire of panel and individual talesmen whether fair and impartial jury can be selected." 437 P.2d, at 569.

With regard to this issue we noted in the body of our opinion in Shapard the crucial question:

" * * * was the jury selected * * * so biased and prejudiced against the accused by the pre-trial publicity that he was unable to secure a fair trial * *." 437 P.2d, at 579.

The jury in the instant case, as in Shapard v. State, supra, was sequestered which was not true in Sheppard v. Maxwell, supra. Furthermore, the jury in the instant case was not permitted to read or hear about the case during the trial. We have carefully reviewed the voir dire examination of the jury herein and find that none of the jurors to whom the case was ultimately submitted was challenged for cause by defense counsel. Eighteen (18) of the seventy-eight (78) prospective jurors examined were excused for cause due to fixed opinions. However, we do not find from the voir dire examination of the jurors to whom the case was ultimately submitted that any jurors had an impression or opinion as a result of pretrial publicity which would preclude them from serving as a fair and impartial juror.

In Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the United States Supreme Court regarding the issue of pre-trial publicity held as follows:

"In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.*" 366 U.S. at 722, 81 S.Ct. at 1642, 6 L.Ed. 2d, at 756. [Emphasis ours].

From a review of the voir dire examination of the jury we conclude, applying this test, that a fair and impartial jury was impaneled to try defendant's case. We find applicable and restate our conclusion reached in Shapard v. State, supra, as follows:

"[O]n the basis of a thorough study of the record of the voir dire examination of the jurors selected to whom the case was ultimately submitted, we are of the opinion that the defendant's contention that he did not receive a fair and impartial trial by reason that a fair and impartial jury could not be obtained from the inhabitants of * * * County, is not supported by the record. The jurors who were extensively examined by defense counsel, who was given wide latitude, as to their qualifications *all* stated that they would base their verdict on the evidence presented and lay aside any impression or opinion which they might have formed as a result of what they had read or heard discussed." 437 P.2d at 591.

Regarding the selection of the jury, it is the further contention of the defendant that the trial court erred in not excusing jurors having previously formed opinions as to the innocence or guilt of defendant. In support of this proposition defendant refers to the juror M. B. McCormick. An examination of the voir dire examination does not show an instance where the defendant challenged a prospective juror for cause and did not have it upheld by

the trial court, except for McCormick. Further, there are many instances where the court on its own motion excused a prospective juror because of a previously formed opinion regarding the case.

In relevant part, the void dire examination of juror McCormick is as follows:

"Q. (THE COURT) From what you have read or heard about the case, through the news media, have you formed or expressed any opinion as to what happened in the case or who may have been at fault in the case, that it would take some evidence to remove now?

A. (MR. McCORMICK) Yes, it would.

Q. (THE COURT) It would take some evidence to remove what you've heard.

A. (MR. McCORMICK) Yes sir.

Q. (THE COURT) In other words, you have a fixed opinion at this time about what happened in the case?

A. (MR. McCORMICK) Oh, I wouldn't say I have a fixed opinion if I understand you—but I have heard about it, but I have no idea what happened or how it happened or what."

\* \* \* \* \* \*

"Q. (THE COURT) Well, do you have any opinion in your mind right now, as you sit there, as to whether this defendant is guilty or innocent of this crime?

A. (MR. McCORMICK) I sure don't have.

Q. (THE COURT) You don't have?

A. (MR. McCORMICK) No.

\* \* \* \* \* \*

"Q. (THE COURT) Do you feel in your own mind, as you're siting there, that you're in the frame of mind that you would want a juror to be, if sitting on either side of this case—the State's side or the defendant's side,—put yourself in the shoes of either side, are you in the same frame of mind you would want a juror to be if you were in their place?

A. (MR. McCORMICK) Yes sir.

Q. (THE COURT) Do you have a free and open mind about this case?

A. (MR. McCORMICK) I sure do.

Q. (THE COURT) And you feel you could deliberate on it fairly and impartially if chosen as a juror?

A. (MR. McCORMICK) Yes sir.

Q. (THE COURT) Is there any reason known to you and not known to the attorneys or to myself, why you could not serve as a fair and impartial juror on this case?

A. (MR. McCORMICK) No sir.

\* \* \* \* \* \*

"Q. (MR. CARGILL) Well, what I want to ask you, and I want to be sure you understand, and that we understand you—I want to ask you, if you have an opinion as to the guilt of the defendant in this case, from what you've read and heard discussed or from any other source—did you form an opinion as to the guilt of the defendant?

A. (MR. McCORMICK) No.

Q. (MR. CARGILL) You did not?

A. (MR. McCORMICK) No.

Q. (MR. CARGILL) Then your mind is open and free at this time—is that correct?

A. (MR. McCORMICK) That's right.
\* \* \*"

Subsequently defense counsel challenged for cause juror McCormick and the challenge was overruled by the trial court (CM 331). From a review of the examination as set forth above, we find no error in the ruling of the trial court overruling the defendant's challenge.

Furthermore, it is abundantly clear that the defendant could not have been prejudiced by this ruling of the trial court since the prospective juror McCormick was peremptorily challenged and excused by defense counsel and did not serve on the jury which heard defendant's case. It is interesting to note that when defense counsel's peremptory challenge of McCormick was questioned, he stated: "Let the record show that defendant excused this juror because he was represented by the as-

sistant district attorney's father in some legal matters." (CM 387).

Title 22 O.S.1961, § 662, provides in relevant part:

"\* \* \* no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him. The challenge may be oral, but must be entered upon the minutes of the court."

From a complete search and examination of the record we find that none of the jurors who ultimately heard defendant's case, were selected inconsistent with the requirements of this statute, and therefore conclude that the defendant was tried by a fair and impartial jury.

It is defendant's second proposition that there was error in the introduction of State's Exhibit Number 14, a color photograph slide of the deceased, Betty McCullough, and the use of a mechanical viewer used to view the slide. In support of his proposition defendant cites Oxendine v. State, Okl.Cr., 335 P.2d 940 (1958), in which this Court held in the second and third paragraphs of its syllabus as follows:

"If the principal effect of demonstrative evidence such as photographs is to arouse the passion of the jury and inflame them against the defendant because of the horror of the crime, the evidence must be excluded.

On the other hand, if the evidence has probative value with respect to a fact in issue that outweighs the danger of prejudice to the defendant, the evidence is admissible even if it is gruesome and may incidentally arouse the passions of the jury." 335 P.2d at 941.

We think the rule of the Oxendine case is valid and controlling, but does not require reversal when applied to the instant case, In Oxendine, photographs of the deceased were taken after extensive autopsy surgery had been performed on the body. Such photographs did not tend to prove or disprove any fact or issue presented for the consideration of the jurors, but rather served merely to inflame and prejudice. In the instant case the color photograph slide was made by Dr. Leo Lowbeer, a pathologist, who testified at the trial that the photograph was a reasonable representation of the body as he viewed it on June 12, 1967. There is nothing to indicate that any of the marks on the body were there as a result of anything but the crime perpetrated on the victim. There was no evidence or any marks caused by a post-mortem examination of the body. The photograph slide was identified at the trial by a neighbor, Mrs. Mary Ellen Howard, as being the deceased, Betty McCullough, and was further identified by Dr. William Jones as being the body he examined initially at the scene of the crime and later in the McVay Funeral Home at Stroud, Oklahoma.

The applicable rule here was stated again in Pate v. State, Okl.Cr., 361 P.2d 1086 (1961), where this Court held in the eighth and ninth paragraphs of its syllabus:

"When a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible in evidence, as an appropriate aid to the jury in applying the evidence and this is equally true whether it relates to persons, things, or places.

Although it is error to receive in evidence gruesome photographs of a homicide victim, designed primarily to arouse the passion of the jury, such photographs are admissible; when they are relevant to the issues before the court and their probative value is not outweighed by the danger of prejudice to the defendant." 361 P.2d at 1088, 1089.

See also Grimes v. State, Okl.Cr., 365 P.2d 739 (1961), and Buntin v. State, Okl.Cr., 403 P.2d 237 (1965).

Defendant also contends that it was error for the trial court to allow the examination of the photograph slide by a mechanical viewer since the viewer was not admitted into evidence. Defendant cites no authority in support of this contention and we find it to be without merit. While it is true that it is improper, as a general rule, for a jury to consider or examine articles not properly admitted into evidence, such is not the case in the instant situation. There was no reason to introduce the mechanical viewer into evidence as it served no purpose except to view the photograph slide which was properly admitted into evidence.

We therefore conclude that the photograph slide of the deceased, in the instant case, was admissible in evidence as an appropriate aid to the jury, having probative value and relevant to the issues before the court. We further conclude that viewing the photograph slide through a mechanical viewer in no way prejudiced the defendant.

It is defendant's third proposition that it was error for the trial court to fail to grant a separate jury trial to determine the sanity of the defendant upon his Motion for Continuance on December 4, 1967, when the case was called for trial. In support of his contention defendant cites 22 O.S.1961, § 1162, the same providing:

> "When an indictment or information is called for trial, or upon conviction the defendant is brought up for judgment, if a doubt arise as to the sanity of the defendant, the court must order a jury to be impaneled from the jurors summoned and returned for the term, or who may be summoned by direction of the court, to inquire into the fact."

The record indicates that on the date that defendant's trial began, his counsel filed a Motion for Change of Venue, Motion to Hold Cause in Abeyance, Motion to Quash the Jury Panel, and Motion for Continuance. Each of these Motions was overruled. Defendant's Motion for Continuance requested "a reasonable continuance

for the trial of this cause" because of counsel's "inability to confer with and have the assistance of the defendant."

Attached to the Motion for Continuance was a letter from Dr. Moorman P. Prosser, a psychiatrist who had examined the defendant on November 30, 1967, at the county jail. Dr. Prosser noted that the defendant apparently was "unwilling or unable" to give any facts which might aid in his defense, but that the doctor was unable to determine whether or not this was an involuntary repression or if defendant was avoiding discussion of his conduct and actions during the critical period of the alleged crime. Dr. Prosser did find the defendant "to be seemingly cooperative and in apparent contact with his environment except for a period of alleged amnesia."

In response to defendant's Motion for Continuance, the State offered in evidence the District Court's Order committing the defendant on June 28, 1967, to the Eastern State Hospital at Vinita, Oklahoma, for a period of 90 days mental observation. Also admitted into evidence was a letter from Dr. B. F. Peterson, Superintendent of Eastern State Hospital, dated September 18, 1967, stating that he found defendant "not psychotic at this time. He is able to distinguish right and wrong, and we feel that he would be able to adequately assist legal counsel in his own behalf."

It should be noted that defense counsel did not ask for a jury trial on the question of the defendant's sanity either in his written Motion for Continuance or in his argument before the trial court on the motion.

It is fundamental that the Motion for Continuance rests within the trial court's sound discretion, and that this Court will not interfere with the trial court's order in the absence of a clear abuse of discretion. Baker v. State, Okl.Cr., 433 P.2d 525 (1967). If it was defense counsel's intent that the trial court should call a jury to determine the question of defendant's sanity, it was not apparent

from his motion. Defense counsel's only request was "a reasonable continuance."

■ In regard to a sanity trial under the authority of 22 O.S.1961, § 1162, this court held in Johnson v. State, 73 Okl.Cr. 370, 121 P.2d 625, in the fourth paragraph of its syllabus:

"* * * while the court cannot act arbitrarily in the matter, it has the right to look to the source of the information, and come to a proper conclusion, from all the facts and circumstances, whether there is a doubt in his mind as to the sanity of the defendant. * * *" 121 P.2d, at 627.

In French v. State, Okl.Cr., 397 P.2d 909 (1964), this Court found no error in the trial court's overruling the motion of the defendant for a jury trial on the issue of sanity. This Court, in affirming the conviction in French v. State, supra, held:

"Had the trial court only the statement of counsel, under oath, of his opinion of the defendant's sanity, after several conferences with him and nothing else, that is no further proof of sanity or insanity, this Court would agree that the trial court would have been remiss in not granting the defendant a trial to determine present sanity. However, in the instant case the trial court had many other sources of information available to him." 397 P.2d at 911.

In Baker v. State, supra, this Court in applying 22 O.S.1961, § 1162, found no error in the failure of the trial court to grant a sanity trial and held as follows:

"In the case at bar, as in the French case, the trial judge had several sources of information available to him to consider, concerning defendant's sanity. From the record, it appears that the trial judge was correct when he decided that the doubt of defendant's sanity was not sufficient to warrant a jury trial on that issue alone." 433 P.2d, at 527.

■ In the instant case defense counsel did not ask for a jury trial on the question of defendant's sanity, and the trial court did not deny such a specific request. Furthermore, we do not find that there was any error in the action of the trial court denying a Motion for Continuance for reason of doubt as to defendant's sanity. In addition to observing the conduct of the defendant, the trial court had before it a letter from the Superintendent of the State Hospital where defendant had undergone 90 days mental observation, who found that the defendant "would be able to adequately assist legal counsel." Also, Dr. Prosser's letter offered in support of defendant's motion did not state that the defendant appeared to be insane, but rather that he was uncooperative with counsel relating to facts of the alleged crime. Accordingly, we must conclude that the trial court acted properly in considering all the facts and circumstances in determining that a doubt had not arisen as to the sanity of the defendant under the terms of 22 O.S. 1961, § 1162, which would require the impanelling of a jury to inquire into the defendant's sanity.

It is defendant's fourth proposition that it was error for the trial court to allow the testimony of Dr. B. F. Peterson, Superintendent of Eastern State Hospital, where defendant was committed for observation by order of the District Court. The defendant contends that a physician-patient relationship existed between the defendant and Dr. Peterson, which rendered the doctor incompetent to testify. Title 22 O.S.1961, § 702, provides in relevant part:

"Except as otherwise provided in this and the following chapter, the rules of evidence in civil cases are applicable also in criminal cases * * *."

Title 12 O.S.1961, § 385, provides in relevant part:

"The following persons shall be incompetent to testify: * * * A physician or surgeon concerning any communication made to him by his patient with reference to any physical or supposed physical disease, or any knowledge obtained by a personal examination of any

such patient: Provided, that if a person offer himself as a witness, that is to be deemed a consent to the examination; * * * "

Defendant argues that the State of Oklahoma has not ruled on the privileged communication issue applicable in this type of situation, but cites as authority for his position, the Washington case of State v. Sullivan, 60 Wash.2d 214, 373 P.2d 474 (1962). In the Sullivan case the Washington Court held it to be error to allow a state-employed psychiatrist to testify in a murder prosecution as to statements made to him by defendant in the course of psychiatric examination and treatment in a state mental hospital. However, there is a significant distinction in the Sullivan case and the case at bar. In the Sullivan case the defendant had been admitted to a state mental hospital for examination and for the purpose of *treating* his ailments. The Washington Court noted that there is a difference in applying the privileged communications rule where the defendant has been committed for purposes of treatment as opposed to observation:

"On the other hand, a forensic examination by a physician is not within the statutory testimonial prohibitions of the doctor-patient privilege. State v. Winnett, 48 Wash. 93, 92 P. 904 (1907); State v. Thomas, 1 Wash.2d 298, 95 P.2d 1036 (1939); State v. Fackrell, Jr., supra. [44 Wash.2d 874, 271 P.2d 679] The reasons are: the relationship of doctor and patient does not exist; the examination is not for the purpose of treatment, but for the publication of results. In Strafford v. Northern Pac. R. Co., 95 Wash. 450, 453, 164 P. 71 (1917), this court said:

' * * * In order to render a physician incompetent, the information which he is called upon to disclose must have been acquired while he was attending the patient in a professional capacity for the purpose of treating her ailments; *there is no privilege when the examination is made by the physician for the express purpose of publishing the results;* such, for example, as testifying in an action for personal injuries. * * * '" 373 P.2d, at 479. [Emphasis ours]

This significant distinction is noted in the general rule as stated in Wharton's Criminal Evidence, 12th Edition, Vol. 3, § 818, p. 171, as follows:

"The privilege does not arise when an examination of a person is made to determine the existence of a fact or condition, as distinguished from giving him medical treatment. Thus, the privilege does not arise, and a physician may testify as to the result of an examination made for the sole purpose of seeing whether the condition of the patient indicated the commission of a crime, or whether the defendant was sane * * "

In 97 C.J.S. Witnesses § 294, p. 828, we find the following:

"No professional relation precluding a disclosure of information acquired arises where a physician employed for that purpose alone makes an examination of a person charged with crime in order to pass on his mental or physical condition; * * * "

This rule has been noted and upheld in several jurisdictions. Simecek v. State, Wisconsin, 243 Wis. 439, 10 N.W.2d 161 (1943); Catoe v. United States, 131 F.2d 16 (D.C. Cir. 1942); Hopkins v. State, 211 Miss. 772, 55 So.2d 467 (1951); Sas v. State, Maryland, 334 F.2d 506 (1964). Typical of this rule's application is the holding of the Nevada Supreme Court in State v. Fourquette, 67 Nev. 505, 221 P.2d 404 (1915), certiorari denied 342 U.S. 928, 72 S.Ct. 369, 96 L.Ed. 691, where insanity had been raised as a defense:

"No professional relation precluding a disclosure of information arises where a physician employed for that purpose alone makes an examination of a person charged with crime, in order to pass on his sanity, as in this case, and not for diagnosis and treatment." 221 P.2d, at 421.

Oklahoma has previously recognized that a physician may testify regarding a patient where a confidential physician-patient relationship does not exist. In Hammonds v. State, Okl.Cr., 366 P.2d 111, we held in the eighth paragraph of the Syllabus, as follows:

"The statute providing that a physician or surgeon shall be incompetent to testify concerning any communication made to him by his patient with reference to any physical or supposed physical condition, or any knowledge obtained by a personal examination of such patient, does not apply when the circumstances surrounding the communication, or knowledge obtained by personal examination, were such as to show that what was said or discovered on the occasion was not intended to be confidential, and especially when third persons were present and heard all that was said between accused and the physician, and the knowledge obtained by a personal examination was as patent to third persons as it was to the physician." 366 P.2d, at 112.

We therefore conclude that where, as in the instant case, the defendant has been committed by court order for mental observation in a state hospital, the examining physician is not incompetent to testify regarding his observation and examination of the defendant when insanity as a defense has been raised.

It is defendant's final proposition that the admission of his statement made to state officers was in violation of his constitutional rights as the State failed to prove that the District Attorney had followed the guidelines as set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3rd 974. Defendant contends that counsel was not permitted to confer with the defendant until after the statement had been completed, although it was known that defendant had counsel, and thus the incustody interrogation renders the confession inadmissible.

The United States Supreme Court's decision in Miranda v. Arizona, supra, is precise in its holding and, as we read it, has not ruled out the admissibility of a voluntary confession made after advising accused of his rights simply because defendant made his confession after refusing an offer of counsel. Defendant does not quote from the Miranda decision, nor does he attempt to indicate in his brief where the record would substantiate his contention that the confession was inadmissible under the Supreme Court's requirements.

In Miranda, the Supreme Court, in summarizing its decision, held as follows:

"Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. * * *" 384 U.S., at 478–479.

The record here reflects that the defendant was arrested on the morning of June 13, 1967, at Stroud, Oklahoma, and was transported to the Lincoln County jail in Chandler, Oklahoma, where he was questioned in the courthoom of the courthouse during the afternoon. In the late afternoon the defendant gave two statements, one of which was taken down by the court reporter and offered in evidence at the trial. In the absence of the jury, the court heard evidence regarding the procedures and circumstances surrounding the taking of the confession. Mr. Frank Grady, an investigator for the Oklahoma Bureau of

Investigation, testified that he was present during the interrogation and when the confessions were taken. Witness Brady testified that before the confession was taken the defendant was advised of his rights as follows:

"Q. (MR. CLIFTON) What was Mr. Koonce told prior to making the statement in the District Courtroom?

A. (MR. BRADY) He was advised of his rights to remain silent, that he didn't have to talk to us if he didn't want to —he was advised that anything he said could be used against him in the Court of law at trial—also, he was advised that if he didn't have funds to hire an attorney that the State would furnish the money to hire an attorney if he requested one—also, he was advised that any time during the questioning, if he wanted to halt the interrogation that he was free to do so, to just ask that the interrogation be halted and we would do so, and if he requested an attorney at this time that one would be furnished at State expense.

Q. (MR. CLIFTON) Now, who advised him of these rights?

A. (MR. BRADY) You, Mr. Clifton.

\* \* \* \* \* \*

Q. (MR. CLIFTON) What was he advised—of what rights was he advised before this second transcribed statement?

A. (MR. BRADY) That he still didn't have to talk to us, and he was asked if he understood his rights and his answer was 'Yes'—and he was asked if he wanted to continue with a statement without counsel being present, and he stated that he did—and he stated that he understood that if he didn't have the funds to hire this attorney that the State would furnish the attorney for him, and also he stated that he knew that he didn't have to talk to us if he didn't want to.

Q. (MR. CLIFTON) After being advised of these rights, what did Ronald Thomas Koonce do?

A. (MR. BRADY) He stated he was willing to give the statement. \* \* \*"

Mrs. Thelma Bullock testified that she was the District Court Reporter and that she had taken in shorthand the statement of the defendant, reduced the same to typing, and the same was now being offered in evidence. Mrs. Opel Wilbanks testified that she was the Court Clerk, and that she was present at the time that the defendant was arraigned following his statement on June 13, 1967, and that after that he was informed that he had the right to counsel and that such would be furnished if necessary. The defendant stated that he did not want an attorney and entered his plea to the charge of Murder.

Mr. Paul Vassar was then called and testified that he was the Assistant District Attorney, that he received a call from Mr. O. A. Cargill, Jr., defendant's attorney of record, after the arraignment of the defendant, regarding whether or not the defendant was in custody. Counsel was informed that the defendant was in custody. Mr. Vassar further testified that defendant's confession had been signed prior to defendant's arraignment. Mr. M. R. Taylor was called and testified that he was Deputy Sheriff of Lincoln County and that when defendant's counsel, Mr. Cargill and Mr. Stanley Pierce, arrived at the jail and were escorted to defendant's cell, that the defendant commented, "I don't want you— I don't have no money."

After hearing this evidence the trial court ruled that the confession was made freely and voluntarily and without any coercion after the defendant had been fully advised of all of his constitutional rights and that the defendant freely, voluntarily and intelligently waived his right to counsel before making the confession and determined that it was proper that said confession be offered in evidence in the presence of the jury for the jury's consideration.

█ From a careful review of the record we conclude that the ruling of the trial court was proper and without error. The record does not support the contention of the defendant, and we find that the admissibility of the confession fully com-

plies with the requirements of Miranda v. Arizona, supra.

For all of the reasons above set forth, the judgment and sentence appealed from is affirmed.

We would commend Messers John L. Clifton and Paul Vassar, for the excellence of the brief prepared by them on behalf of the State of Oklahoma. The brief met fully all of the issues raised in the defendant's brief and was of immeasurable assistance to this Court in dealing with the complex questions determined in this appeal.

The date originally appointed for the execution of the defendant, Ronald Thomas Koonce, having passed pending this appeal, it is ordered, adjudged, and decreed by this Court that the judgment and sentence of the District Court of Lincoln County, Case No. 3298, be carried out by the electrocution of the defendant, Ronald Thomas Koonce, by the Warden of the State Penitentiary at McAlester, Oklahoma, on Friday, August 15, 1969.

BRETT, P. J., and NIX, J., concur.

APPENDIX

QUESTIONING OF JURORS EXCUSED BECAUSE THEY WOULD NOT IMPOSE DEATH SENTENCE

*CASE MADE, VOL. I, Pages 175, 176*

"MR. CLIFTON: In other words, Mr. Steatman, in the proper case—now, in the proper case, you are stating to counsel and the Court that you could conscientiously agree to a verdict imposing the death penalty. * * *

MR. CLIFTON: Mrs. Ingram, how about you?

A. (MRS. INGRAM)  No, I wouldn't.

Q. You could not?

A. No.

MR. CLIFTON: Comes now the State at this time and challenges this juror.

THE COURT: Do you challenge this juror?

MR. CLIFTON: Yes Sir.

THE COURT: Challenge will be sustained—Mrs. Ingram, you will be excused."

*CM, VOL. I, Pages 182, 183*

"MR. CLIFTON: Let me ask you, specifically,—is there anything in your background, religious, or otherwise, that would cause you to have conscientious scruples against imposing the death penalty in the proper case?

A. (MR. MILLER)  Religious.

Q. Religious or otherwise?

A. Religious, I could not.

Q. You could not?

A. I could not.

MR. CLIFTON: I challenge Mr. Miller for cause.

THE COURT: Do I understand that you could not return a verdict providing for the death penalty in the proper case where the law warrants, under any circumstances? Is that right?

A. Yes.

Q. (THE COURT)  You could not— is that right?

A. That is right.

THE COURT: Do you challenge the juror?

MR. CLIFTON: Yes sir.

THE COURT: The challenge will be sustained—you will be excused."

*CM, VOL. I, Page 193*

"MR. CLIFTON: Mrs. Frisby, do you entertain any conscientious scruples against imposing the death penalty in the proper case?

A. (MRS. FRISBY)  Because of my religion, I don't believe I could.

Q. You don't believe you could?

A. No, sir.

MR. CLIFTON: I would like to challenge this juror for cause.

THE COURT: Do I understand, Mrs. Frisby, that in the proper case where the law and the evidence warrants, that you

could not, without doing violence to your conscience, return a death penalty?

A. I couldn't.

THE COURT: Does counsel challenge this juror?

MR. CLIFTON: Yes sir.

THE COURT: Mrs. Firsby, you will be excused."

*CM, VOL. I, Pages 201, 202*

"Q. (MR. CLIFTON) I will ask you, further, in the proper case, could you conscientiously agree to a verdict imposing the death penalty?

A. (MRS. FOX) No sir, I could not.

Q. Well, is there something in your religious background that would prevent you?

A. I could not.

MR. CLIFTON: I would like to excuse this juror for cause.

THE COURT: Mrs. Fox, do I understand that in a case where the law and the evidence warrant, that you could not, without doing violence to your conscience, agree to a verdict for the death penalty? Is that right?

A. I could not.

THE COURT: You will be excused."

*CM, VOL. I, Page 212*

"Q. (MR. CLIFTON) Well, how do you feel about—or do you feel or entertain such conscientious opinions as would preclude you from finding the defendant guilty if the offense he is charged with is punishable with death?

A. (MRS. COOK) Well, I wouldn't want to go that far.

Q. In other words, in the proper case you could not conscientiously agree to imposing the death penalty?

A. I don't think so.

MR. CLIFTON: We challenge this juror for cause.

THE COURT: You mean, even in a case where the law and the evidence warrants, in your mind, you couldn't even

though the law and the evidence warrants, impose the death penalty?

A. I don't think so.

THE COURT: You may be excused. Next juror."

*CM, VOL I, Pages 237, 238*

"MR. CLIFTON: Mrs. Reed, as indicated to the Court, you have some reservations about the death penalty—so let me ask you specifically, in the proper case, could you conscientiously agree to a verdict imposing the death penalty, where the law and the evidence warrants?

A. (MRS. REED) Sir, I just don't believe in capital punishment.

Q. Well, is there something in your religious background, moral or otherwise * * * ?

A. Yes.

Q. * * * In which you just could not agree to a verdict imposing the death penalty?

A. I don't think I could—I think there would be another way for him.

MR. CLIFTON: We challenge for cause.

THE COURT: Challenge will be sustained—you are excused, Mrs. Reed."

*CM, VOL. I, Page 295*

"Q. (MR. CLIFTON) Further, let me ask you, if in the proper case, could you conscientiously agree to a verdict imposing the death penalty?

A. (MRS. SLEMP) I couldn't do that.

Q. In other words, you do entertain a conscientious scruple against imposing the death penalty in the proper case?

A. Yes.

MR. CLIFTON: We would like to challenge this juror for cause.

MR. CARGILL: We object for the reason that there is equal punishment—the jury is not required to give the death penalty—they can give life or death and we object to the disqualification of this juror.

THE COURT: Overruled—the challenge will be sustained.

MR. CARGILL: Exceptions.

THE COURT: Mrs. Slemp, you may be excused."

*CM, VOL. I, Page 305*

"MR. CLIFTON: Let me ask you again —in a case where the law and the evidence warrants, could you, without doing violence to your conscience, agree to a verdict for the death penalty?

A. (MR. SHAFFER) I don't think I could.

MR. CLIFTON: We challenge this juror for cause.

MR. CARGILL: Same objection as to the challenges heretofore made, Your Honor.

THE COURT: Counsel's objection overruled and the challenge will be sustained and defendant allowed exceptions. You may be excused, Mr. Shaffer."

*CM, VOL. I, Pages 392, 393*

"Q. (MR. CLIFTON) Do you feel that in the proper case, you could conscientiously agree to a verdict imposing the death penalty?

A. (MR. DANKER) No, sir.

Q. You do not? In other words, do you feel that you have or entertain some conscientious scruples against imposing the death penalty?

A. Yes sir.

MR. CLIFTON: We challenge this juror for cause.

THE COURT: Challenge sustained.

MR. CARGILL: Same objection heretofore made.

THE COURT: Objection overruled and exceptions—Mr. Danker, you will be excused. You may step down."

*CM, VOL. I, Pages 432, 433*

"Q. (MR. CLIFTON) Well, let's go on with that—you, then, do have or you couldn't conscientiously agree to a verdict imposing the death penalty?

A. (MR. GIBSON) That's correct.

MR. CLIFTON: We challenge this juror.

MR. CARGILL: Same objection heretofore made.

THE COURT: Objection overruled and exceptions. You will be excused, Mr. Gibson—you may step down."

*CM, VOL. I, Page 458*

"Q. (MR. CLIFTON) Could you in the proper case conscientiously agree to a verdict imposing the death penalty?

A. (MR. WILSON) No, sir.

Q. You could not?

A. No, sir.

MR. CLIFTON: I challenge this juror for cause.

MR. CARGILL: Object for same reasons.

THE COURT: Objection overruled, exceptions allowed. You may be excused, Mr. Wilson."

*CM, VOL. I, Page 465*

"Q. (MR. CLIFTON) Are you telling this court and counsel, then, that in the proper case you could not conscientiously agree to a verdict imposing the death penalty?

A. (MR. RALSTON) No, sir, I could not.

MR. CLIFTON: We challenge this juror for cause.

MR. CARGILL: We object for the same reason.

THE COURT: Show the defendant's objection overruled, and exceptions—Mr. Ralston, you will be excused."

*CM, VOL. I, Page 469*

"MR. CLIFTON: According to your answers to the court, Mrs. Brown, in a proper case, could you conscientiously agree to a verdict, a jury verdict, imposing the death penalty?

A. (MRS. BROWN) No, sir.

MR. CLIFTON: We challenge this juror for cause.

MR. PIERCE: Same objection.

THE COURT: Show the defendant's objection overruled, and exceptions. You will be excused, Mrs. Brown."

*CM, VOL. I, Pages 486, 487*

"Q. (MR. CLIFTON) Well, assuming that you are qualified to serve, or were qualified to serve, on a jury in a criminal case, in the proper case, could you conscientiously agree to a verdict, a jury verdict, imposing the death penalty?

A. (MRS. CUPP) I don't believe I can.

Q. Well, let me ask another way—for you to consider—in a case where the law and the evidence warrants, could you, without doing violence to your conscience, agree to a verdict for the death penalty?

A. I would like to ask a question—if a person were in prison for life and could not be paroled, in a case such as this case, it would be all right—but if they would be returned to the community, I would, then—if I had to, I would say that they should be punished,—but I don't believe I could do it—really I don't.

MR. CLIFTON: I think I will challenge this juror for cause.

MR. PIERCE: Your honor, please, we will make the same objection.

THE COURT: Show defendant's objection overruled and exceptions. You may be excused, Mrs. Cupp."

*CM, VOL. I, Page 492*

"Q. (MR. CLIFTON) Do you feel that in the proper case, you could conscientiously agree to a verdict imposing the death penalty?

A. (MRS. BEASLER) Well, * * *

Q. In the proper case?

A. Not definitely—I would have the person to be returned to the state penitentiary for life.

Q. In other words, you could not, in the proper case, conscientiously agree to a verdict imposing the death penalty?

A. No.

MR. CLIFTON: I challenge this juror for cause.

MR. PIERCE: Your Honor, please, the same objection.

THE COURT: Objection overruled and exceptions. You will be excused, Mrs. Beasler."

*CM, VOL. II, Pages 507, 508*

"Q. (MR. CLIFTON) In the proper case, could you conscientiously agree to a verdict imposing the death penalty?

A. (MR. GRIGGS) I believe I could. (hardly audible)

Q. Let me ask you further—in a case where the law and the evidence warrants, could you, without doing violence to your conscience, agree to a verdict imposing the death penalty?

A. No, I don't believe I could.

Q. You don't think you could in that instance?

A. No.

Q. Then do you feel that you entertain or have a conscientious scruple against agreeing to a verdict that would impose the death penalty?

A. I don't believe I understood it.

Q. Let's go back, then to my first question—in the proper case, you already stated that you agreed to the State's power to punish an individual, having been found guilty, and the jury having reached a verdict beyond a reasonable doubt—now as to the power to punish, I want to know just how far you would go—in the proper case, could you conscientiously agree, in your own conscience could you agree with the other jurors, after deliberating, could you agree to a verdict imposing the death penalth?

A. No, I don't think I could.

MR. CLIFTON: I challenge this juror for cause.

MR. PIERCE: Your Honor, please our same objection.

THE COURT: Show defendant's objection overruled and exceptions. You will be excused, Mr. Griggs."

*CM, VOL. II, Pages 510 and 511*

"Q. (MR. CLIFTON) You state to the court and counsel that in the proper case, you could not conscientiously agree to a verdict imposing the death penalty?

A. (MRS. KINDER) I don't think I could.

MR. CLIFTON: I challenge this juror for cause.

MR. PIERCE: Same objection, Your Honor.

THE COURT: Show defendant's objection overruled and exceptions. You will be excused, Mrs. Kinder."

*CM VOL. II, Pages 513, 514*

"Q. (MR. CLIFTON) Now, then, participating in this system and sitting where you are now, should you be qualified to sit on this jury panel, in the proper case, could you conscientiously agree with the other members of the jury panel, in a verdict imposing the death penalty?

A. (MR. HASKIN) I don't believe I could.

MR. CLIFTON: I challenge this juror for cause.

MR. PIERCE: Same objection, Your Honor.

THE COURT: Defendant's objection overruled and exceptions. You may be excused, Mr. Haskin."

*CM, VOL. II, Page 555*

"Q. (MR. CLIFTON) Well, that being true in the proper case, could you conscientiously agree to a verdict imposing the death penalty?

A. (MRS. LIVESAY) No.

MR. CLIFTON: We challenge the juror for cause.

MR. CARGILL: Same objection, Your Honor.

THE COURT: Objection overruled and exceptions. You may be excused, Mrs. Livesay."

*CM, VOL. II, Pages 559, 560*

"Q. (MR. CLIFTON) In the proper case, could you conscientiously agree, within the jury panel, to a verdict imposing the death penalty?

A. (MR. BURCHETT) No, sir, I could not.

Q. You could not?

A. No, sir.

MR. CLIFTON: We challenge this juror for cause.

MR. PIERCE: Your Honor, please, the same objection.

THE COURT: Show defendant's objection overruled and exceptions. You may be excused, Mr. Burchett."

*CM, VOL. II, Pages 582, 583*

"Q. (MR. CLIFTON) You indicated to the court that you might have some reservation about punishment—in a proper case, could you, as a member of the jury, or as a qualified member of the jury, in the proper case, could you conscientiously agree to a verdict imposing the death penalty?

A. (MR. LADD) I could not.

MR. CLIFTON: We challenge this juror for cause.

MR. PIERCE: Your Honor, please, the same objection.

THE COURT: Show defendant's objection overruled and exceptions. You will be excused, Mr. Ladd."